**09-3627-cr (L)**
**United States v. Nouri**

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: September 20, 2011          Decided: March 4, 2013)

Docket No. 09-3627-cr(L), 09-5215-cr(C), 10-0716-cr(C), 10-2107-cr(C), 10-2126-cr(C)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

United States of America,
          *Appellee*,

v.

Dennis Michael Nouri, Anthony Martin, Reza Eric Nouri,
also known as Reeza Eric Nouri,
          *Defendants - Appellants*,

Ruben Serrano, Alain Lustig,
          *Defendants*.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Before:   LEVAL, HALL, *Circuit Judges*.[*]

        Defendants Dennis Michael Nouri, Reza Eric Nouri, and Anthony Martin appeal from judgments of conviction entered by the United States District Court for the Southern District of New York (Chin, *J.*), raising several contentions, including the inappropriate inclusion of honest services in the securities fraud and wire fraud instructions. The Court of Appeals (Leval, *J.*)

---

[*] The Honorable Roger J. Miner, who was originally assigned to the panel, died prior to the resolution of this case. The remaining two members of the panel, who are in agreement, have determined the matter. *See* 28 U.S.C. § 46(d); IOP E(b); *United States v. Desimone*, 140 F.3d 457, 458-59 (2d Cir. 1998).

concludes that there is no merit to any of their contentions. Accordingly, the judgments of conviction are **AFFIRMED**.

David S. Leibowitz, Avie Weitzman, Brent S. Wible, Assistant United States Attorneys, *for* Preet Bharara, United States Attorney for the Southern District of New York, New York, NY, for *Appellee*.

Roland R. Acevedo, Scopetta Seiff Kretz & Abercrombie, New York, NY, for *Appellants Dennis Michael Nouri and Reza Eric Nouri*.

Alexander E. Eisemann, New York, NY, for *Appellant Anthony Martin*.

LEVAL, *Circuit Judge*:

Defendants Dennis Michael Nouri ("Michael Nouri"), Reza Eric Nouri ("Eric Nouri"), and Anthony Martin ("Martin") appeal from judgments of conviction entered in the United States District Court for the Southern District of New York (Chin, *J.*). All three were convicted in a jury trial of conspiracy to commit securities fraud, wire fraud, and commercial bribery in violation of 18 U.S.C. § 371, and of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2. Michael and Eric Nouri were also convicted of wire fraud in violation of 18 U.S.C. §§ 1343, 1346, and 2, and of commercial bribery in violation of 18 U.S.C. §§ 1952(a)(3) and 2. Michael Nouri was sentenced principally to 96 months' imprisonment, Eric Nouri to 18 months' imprisonment, and Martin to 57 months' imprisonment.

Each of the appellants contends on this appeal that the district court erred in instructing the jury on fraud by deprivation of honest services, especially in the context of securities fraud, and that there was insufficient evidence to sustain convictions for securities fraud. Martin also contends that there was insufficient evidence to convict him of honest-services wire fraud, that

2

the district court erroneously limited his examination of a witness, and that his sentence was unreasonable. We find no merit to appellants' arguments and accordingly affirm the judgments.

**BACKGROUND**

We summarize the trial evidence in the light most favorable to the government, as required in assessing a challenge to the sufficiency of the evidence. *United States v. Hsu*, 669 F.3d 112, 114 (2d Cir. 2012).

Michael Nouri was the President, Chief Executive Officer, and Chairman of the Board of Directors of Smart Online, Inc., a public company, which provided assorted internet-based assistance to small businesses. The stock of Smart Online was traded beginning April 15, 2005 on the Over-the-Counter Bulletin Board. Eric Nouri is Michael Nouri's younger brother and was employed at Smart Online as a content engineer. Smart Online never turned a profit.

*A. The Market Manipulation Scheme*

William Blume, a licensed stockbroker who worked at Maxim Group ("Maxim") from 2005 through 2007, testified pursuant to a cooperation agreement with the government that he met Michael Nouri in May 2005 and told Michael that he, Blume, could pay brokers to purchase Smart Online stock. Michael Nouri agreed to this plan and gave Blume a check for $10,000 to be used for such payments to brokers.

Sometime after that initial meeting, Michael Nouri asked Blume to enter into consulting agreements with Smart Online "for everybody's protection." Trial Tr. 447:23-448:9. Blume agreed but specified that the consulting contracts be in the names of his wife, Myra, and son, Mitchell, rather than his own. Blume explained that he did not want his firm to know of his receipt of payments. Michael Nouri did not object to making the consulting agreements and

3

sending the payments in the name of Blume's wife and son. Eric Nouri facilitated the process of setting up the agreements. The agreements did not reveal that the payments to Blume's wife and son were in exchange for Blume's customers' purchases of Smart Online shares.

Once the paperwork was signed, Blume began receiving payments from Smart Online as compensation for purchasing Smart Online shares for his customers' accounts and for getting other brokers to do the same. Typically, Blume was paid $1 for each share of Smart Online purchased. Between 2005 and 2007, Blume received over $100,000 from Smart Online, usually by wire transfers sent by Eric Nouri. The wire transfers from Smart Online were in the names of Mitchell, Andrew, or Myra Blume. Blume did not reveal to his customers for whom Smart Online stock was purchased that he was receiving money from Smart Online for their purchases of Smart Online stock. Blume testified that he did not tell them about the payments because if they knew, they would not have purchased the shares and would have told his employer, Maxim, about the payments. Blume did not want Maxim to know about the payments because he understood that his receipt of the payments was illegal and violated Maxim's rule that its brokers not receive compensation from third parties.

Blume recruited several brokers, including the appellant Martin, Ruben Serrano, James Doolan, and Alan Kaiten–all of whom worked at Maxim–as well as Alain Lustig–who worked at Jesup & Lamont Inc.–to purchase Smart Online stock for their customers, for which the brokers would receive a portion of the money Blume received. Blume told Martin he would pay Martin if Martin's customers bought Smart Online shares and that the money was from Michael Nouri, the CEO of Smart Online. Normally, brokers were compensated by receiving a portion of sales commissions charged by their employer to their customers, and commissions were generally

under five percent of the amount of the transaction. Maxim's average commission was approximately two percent. Blume paid Martin approximately half a dozen times for buying Smart Online stock, at times for amounts as large as 44,000 shares.

In addition to the brokers named above, David Gardner, a broker who worked at vFinance between 2003 and 2006, and who testified pursuant to a cooperation agreement, received payments from Michael Nouri as the president of Smart Online for purchasing Smart Online shares in his customers' accounts and did not disclose the payments to his customers.

Gardner entered into a consulting agreement with Smart Online in July 2005 and then promoted Smart Online to other brokers in July and August 2005. Shortly thereafter, Smart Online began compensating Gardner for his customers' purchases of Smart Online shares. Gardner purchased over 100,000 shares of Smart Online for his customers. Smart Online paid Gardner more for those purchases than the authorized brokerage commissions he made on them. At Michael Nouri's direction, Gardner purchased Smart Online stock for his customers at an inflated price that was higher than the customers otherwise could have obtained.

Gardner did not disclose to vFinance that he was being paid by Smart Online to purchase Smart Online shares because he understood his receipt of such payments violated the securities laws and vFinance policy. Gardner told Michael Nouri that he had not disclosed the payments to vFinance. With the exception of one customer, Gardner did not inform his customers that he received compensation from Smart Online for their purchases of Smart Online stock. Gardner also did not disclose to his customers that Michael Nouri was directing him to purchase shares for them at higher prices than he otherwise could have obtained.

5

In addition to using Smart Online funds to pay Blume and Gardner for purchases of Smart Online stock, Michael and Eric Nouri would also often direct them when to buy shares and at what prices. For example, Michael Nouri would frequently direct Gardner to delay a purchase until the end of the day to so as show interest in the stock at the market close and to purchase shares at prices higher than the prices at which they were offered. Blume and Gardner both testified that they understood that the purpose of paying brokers to purchase Smart Online shares, and of purchasing shares as Michael Nouri directed, was to generate volume and to elevate the share price, and thereby to help Smart Online qualify for listing on the NASDAQ Stock Market. William Lederer, Chairman and CEO of Socrates Media, LLC in 2005, testified that, in August 2005, Michael Nouri told him of Nouri's desire to have Smart Online's stock trade on NASDAQ and said he was supporting the stock price and could prevent a decline in the stock price using his contacts with brokers.

In September 2005, Smart Online submitted a listing application to NASDAQ. At that time, Smart Online's stock price was over $10 per share, having risen from $1.50 five months earlier, when it first traded on the Over-the-Counter Bulletin Board. On January 6, 2006, NASDAQ approved Smart Online's application. The U.S. Securities and Exchange Commission ("SEC"), however, suspended trading in Smart Online's stock on January 17, 2006, before its listing became effective.

In December 2005, the Federal Bureau of Investigation ("FBI") approached Blume regarding his connection to Smart Online, and around January 2006, after the suspension of Smart Online's stock, the FBI similarly approached Gardner. Gardner and Blume agreed to cooperate with the FBI by allowing the FBI to record their conversations with Michael Nouri,

Eric Nouri, and brokers, and to photograph Blume paying the brokers. In recorded conversations prior to the trading suspension, Michael and Eric Nouri directed Blume when, how, and at what price Blume and his brokers should purchase Smart Online shares, and discussed paying Blume for the purchases. In another recorded conversation, Blume and Eric Nouri talked about purchases of Smart Online shares and about paperwork relating to the wire transfers. Blume also recorded a discussion with Martin about obtaining Smart Online's stockholder list so Martin would be able to suggest to stockholders that they buy more shares, and about Blume making payment to Martin.

After the SEC suspended trading in Smart Online, Michael Nouri instructed Blume and Gardner in recorded conversations to tell the SEC that they never paid brokers to purchase shares and that they purchased Smart Online shares because they believed in the company. The SEC later lifted its trading suspension. In subsequent conversations, Michael Nouri said he would continue paying Blume to purchase Smart Online shares, but cautioned Blume to be careful.

*B. Brokers' Misrepresentations and Omissions to Customers*

Several regulatory and compliance officials testified at trial about the rules that apply to stockbrokers. William Park, a director in the enforcement department of the Financial Industry Regulatory Authority ("FINRA"), testified as an expert in the securities industry about the legal obligations of brokers in dealing with their customers and related rules. According to his testimony, brokers have obligations to be fair, just, and equitable with their clients, to make sure they give their clients all the information necessary to make an informed decision, and to execute clients' orders as quickly as possible. Industry rules, furthermore, require a broker to get written approval from their firm before accepting compensation from an officer or director of a third-

7

party company to solicit customers to purchase the company's stock. The company would also be required to disclose those payments in public filings.

Michael Clements, former Chief Compliance Office of Jesup & Lamont Inc., Alain Lustig's employer, testified that brokers were required under FINRA rules to disclose any outside business obligations to their firms and under Jesup & Lamont's rules to obtain approval from Jesup & Lamont's compliance group prior to accepting compensation for business activity from persons other than Jesup & Lamont. John Sergio, a former examiner at the National Association of Securities Dealers (the predecessor to FINRA) and Chief Operating Officer of Maxim, Martin's employer, testified that industry rules required that a broker seek, in writing, and obtain his employer's approval for any business activities other than his employment at his securities firm. The rules also prohibited stockbrokers from receiving compensation from a third-party company for selling the company's stock to their customers and from receiving direction from a third party regarding when or at what price to place a customer's order unless the customer had granted that third party power of attorney. He also testified that Maxim's supervisory procedures explicitly required employees to disclose outside business activities prior to engaging in them and prohibited employees from offering or soliciting bribes. None of the defendant brokers who worked at Maxim disclosed to Maxim their business arrangements related to Smart Online.

The government also called as witnesses three investors whose brokers—Martin, Lustig, and Serrano—had either recommended or purchased Smart Online stock in exchange for payments from Smart Online. In no case had the brokers told their customers that the brokers would receive compensation from Smart Online for the customers' purchases of Smart Online

8

stock. Had the investors known, they would not have allowed their brokers to purchase Smart Online stock. Martin and Serrano told their customers that Smart Online was a good investment.

*C. Defense Case*

Michael Nouri called two witnesses: Jeffrey LeRose, the former chairman of the Smart Online Board of Directors, and Henry Nouri, Michael's brother and co-founder of Smart Online. LeRose testified about Smart Online's investor relations program, which was run by Michael Nouri and two other individuals, and which was suspended after the SEC suspended trading in Smart Online. LeRose acknowledged he was never told that brokers were being paid money for purchasing Smart Online shares for their customers. He believed such payments should have been disclosed in Smart Online's public filings, which they never were. Henry Nouri testified that, while he was a member of the Smart Online Board of Directors, he and the other board members approved investment relations contracts. His understanding was that the investor relations consultants were hired to find investors for Smart Online, but he was not involved with dealing with the investor relations contracts or consultants.

Martin called one witness, Reverend Robert Richardson, Martin's friend who worked as a broker with Martin in the late 1980s and used Martin as a broker in the 2000s. Based on Martin's recommendation and information Richardson reviewed about Smart Online, Richardson purchased shares of Smart Online. Richardson acknowledged that Martin did not tell Richardson that he was receiving payment from Smart Online in connection with his customers' purchases of Smart Online stock. Richardson testified that if he had known that Martin was receiving such payment, it would not have made a difference to him and that he never doubted the sincerity of Martin's opinions about Smart Online.

9

**DISCUSSION**

**I. Jury Charge**

Defendants contend the jury charge was erroneous in several respects. They argue that the honest-services wire fraud charge was erroneous in light of *Skilling v. United States*, 130 S. Ct. 2896 (2010). They also argue that the court erred by including honest-services fraud concepts in the securities fraud instructions and by failing to explain the significance between discretionary and non-discretionary accounts as they relate to a broker's fiduciary duty to his customers. Martin claims that the court failed to provide the correct legal standard for the "in connection with" requirement in the securities fraud charge. While some of the defendants' contentions are correct, there was no error that would justify vacating the convictions.

*A. Honest-Services Wire Fraud*

Defendants contend the court's instructions on honest-services wire fraud were erroneous because the court failed to limit the definition of honest-services wire fraud to bribery and kickback schemes, as mandated by the Supreme Court's subsequent ruling in *Skilling v. United States*, 130 S. Ct. 2896, 2931 (2010).[1] We agree that the charge incorrectly stated the law. However, because there was no objection to the charge, we review the charge under the plain error standard and under that standard find the error did not affect substantial rights of the defendants.

---

[1] Martin also challenges the district court's instruction that Martin owed a duty of honest services to his employer. This challenge is meritless. The "existence of a fiduciary relationship" between an employee and employer is "beyond dispute," and the violation of that duty through the employee's participation in a bribery or kickback scheme is within the core of actions criminalized by § 1346. *Skilling*, 130 S. Ct. at 2930-31 & n.41; *see also United States v. Rybicki*, 287 F.3d 257, 261 (2d Cir. 2002) (under pre-*McNally* law, which § 1346 was meant to reinstate, "'[i]n the private sector . . . brokers . . . and others with clear fiduciary duties to their employers . . . [were] found guilty of defrauding their employers . . . by accepting kickbacks or selling confidential information'" (fifth alteration in original) (quoting *McNally v. United States*, 483 U.S. 350, 363 (1987) (Stevens, J., dissenting), *superseded by* 18 U.S.C. § 1346)).

Where a defendant has preserved his claim of error by a timely objection calling the district court's attention to the problem when the court would have the opportunity to fix the error, we review a district court's jury charge *de novo*, and will vacate a conviction for an erroneous charge unless the error was harmless. *See Boyce v. Soundview Tech. Grp.*, 464 F.3d 376, 390 (2d Cir. 2006). But where, as here, a defendant fails to make a timely objection, we review the instruction for plain error. Fed. R. Crim. P. 30(d), 52(b); *see also United States v. Middlemiss*, 217 F.3d 112, 121 (2d Cir. 2000).[2] Under the plain-error rule, we may overturn a conviction by reason of an error not timely raised at trial only if the appellant demonstrates that "(1) there is an 'error'; (2) the error is 'clear or obvious, rather than subject to reasonable dispute'; (3) the error 'affected the appellant's substantial rights . . .'; and (4) 'the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Marcus*, 130 S. Ct. 2159, 2164 (2010) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)).

In determining whether error occurred, we examine the jury instructions based on the law as it stands "'at the time of the appeal.'" *United States v. Needham*, 604 F.3d 673, 678 (2d Cir. 2010) (quoting *United States v. Ballistrea*, 101 F.3d 827, 835 (2d Cir. 1996)). Accordingly, to determine whether the charge was correct, we must consider the Supreme Court's subsequent ruling in *Skilling*. In *Skilling*, the Supreme Court considered the constitutionality of the honest-

---

[2] We have previously stated that where "the source of plain error is a supervening decision," a modified plain error rule applies, under which "the government, not the defendant, bears the burden to demonstrate that the error . . . was harmless." *United States v. Henry*, 325 F.3d 93, 100 (2d Cir. 2003) (internal quotation marks omitted) (ellipsis in original). The government contends that the modified plain error rule is inconsistent with the Supreme Court's decision in *Johnson v. United States*, 520 U.S. 461 (1997). Because we would reach the same conclusion under either standard, we need not resolve that question.

11

services fraud statute, 18 U.S.C. § 1346. The defendant in *Skilling* had been convicted, *inter alia*, of conspiracy to commit honest-services fraud based on his undertaking to "defraud Enron's shareholders by misrepresenting the company's fiscal health, thereby artificially inflating its stock price" and by personally profiting from that fraudulent scheme through the receipt of salary and bonuses and the sale of Enron stock. 130 S. Ct. at 2911, 2934. The Supreme Court rejected the government's argument that § 1346 proscribed "undisclosed self-dealing by a public official or private employee—*i.e.*, the taking of official action by the employee that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty." *Id.* at 2932 (internal quotation marks omitted). The Court held that, in order to preserve the statute from being unconstitutionally vague, "§ 1346 criminalizes *only* the bribe-and-kickback core of the pre-*McNally* case law." *Id.* at 2931. Because it was not alleged that Skilling "solicited or accepted side payments from a third party in exchange for making . . . misrepresentations," the Court concluded that Skilling did not commit honest-services fraud. *Id.* at 2934. It therefore vacated his conspiracy conviction. *Id.* at 2934-35.

In applying *Skilling*'s limitation on honest-services wire fraud, we have explained that, to violate the right to honest services, the charged conduct must involve a quid pro quo, *i.e.*, an "intent to give or receive something of value in exchange for an . . . act." *United States v. Bruno*, 661 F.3d 733, 743-44 (2d Cir. 2011); *see also United States v. Bahel*, 662 F.3d 610, 635-36 (2d Cir. 2011). Thus, in *Bruno*, we held that the district court's charge that honest-services fraud encompassed an official's failure to disclose that his interest in his private economic affairs clashed or appeared to clash with the proper administration of his office was erroneous after *Skilling* because it "did not require the jury to find that [the fraud involved] accept[ance of] bribes or kickbacks to be convicted of honest services fraud." 661 F.3d at 739-40.

12

A similar error exists in the district court's honest-services wire fraud charge to the jury in this case. The court's charge on the wire fraud counts was, in relevant part, as follows:

> The first element [of a wire fraud count] the government must prove beyond a reasonable doubt is the existence of a scheme or artifice to defraud others of money or property or the intangible right to honest services by means of false or fraudulent pretenses, representations, or promises.
>
> . . .
>
> With respect to intangible rights, an employee inherently owes his employer a duty of honest, faithful, and disinterested service. Specifically, in the context of this case, a broker owes the brokerage firm that employs him a duty to act in a way that is consistent with his employment agreement and not to abuse his position at the firm to engage in secret transactions based on his personal financial interests, if you find that a duty to disclose existed.
>
> . . .
>
> With respect to the alleged scheme to deprive the broker's employer of the intangible right to the broker's services, as I already told you, an employee owes a duty of honest services to his employer. To establish a deprivation of honest services under the wire fraud statute as against a particular defendant, the government must prove beyond a reasonable doubt that the defendant you are considering participated in a scheme with the intention that a broker failed to provide honest services to his employer by making false and misleading representations.

Trial Tr. 1642-45.

The charge did not require the jury to find that the scheme involved the payment of bribes or kickbacks to convict on honest-services fraud. Therefore, under *Skilling* and *Bruno*, this instruction was erroneous.

We nevertheless conclude that the convictions should not be overturned because the error did not affect defendants' substantial rights. *See United States v. Cain*, 671 F.3d 271, 287-88 (2d Cir. 2012). "In the ordinary case, to meet this standard an error must be 'prejudicial,' which means that there must be a reasonable probability that the error affected the outcome of the trial." *Marcus*, 130 S. Ct. at 2164; *see also United States v. Dominguez Benitez*, 542 U.S. 74, 83 (2004) ("A defendant must . . . satisfy the judgment of the reviewing court . . . that the probability of a different result is 'sufficient to undermine confidence in the outcome' of the

13

proceeding." (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). Where the error is an instruction that incorrectly omitted an element of the offense, we will sustain the conviction if we find that "the jury would have returned the same verdict beyond a reasonable doubt." *United States v. Gomez*, 580 F.3d 94, 101 (2d Cir. 2009); *cf. Neder v. United States*, 527 U.S. 1, 18 (omission of element in jury instructions is harmless if it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error"). If the evidence bearing on the omitted element is "overwhelming and essentially uncontroverted, there is no basis for concluding that the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Gomez*, 580 F.3d at 100-01. Where, however, the evidence supporting the omitted element was controverted, we look to "(a) whether there was sufficient evidence to permit a jury to find in favor of the defendant on the omitted element, and, if there was, (b) whether the jury would nonetheless have returned the same verdict of guilty." *Needham*, 604 F.3d at 679 (internal quotation marks omitted).

We have no doubt that, had the jury been properly instructed, it would have found the defendants guilty of honest-services wire fraud based on their scheme of concealed bribery. The most persuasive demonstration comes from the fact that the jury *did* find Michael Nouri and Eric Nouri guilty of violating the commercial bribery statute, 18 U.S.C. § 1952, based on the same facts. It is therefore not open to dispute that the jury concluded that they committed the crime of commercial bribery.

Even were the Nouris not convicted of commercial bribery, we would find no likelihood of a different result had the jury been instructed on the narrowed scope of honest-services fraud. The scheme constituting the offense was a scheme of bribery involving secret payments to brokers by Smart Online, which were arranged by the Nouris, in exchange for the brokers

14

convincing their customers to purchase Smart Online stock. The evidence overwhelmingly showed the participation of all three appellants in the scheme—with Michael Nouri orchestrating it, Eric Nouri helping to carry it out, and stockbroker Martin receiving substantial bribes in exchange for procuring his customers' purchases of Smart Online shares. We can see no reasonable likelihood that the jury would have reached a different verdict on the honest-services fraud charges against defendants had the jury been instructed, in accordance with *Skilling*, that the offense of honest-services fraud could be based only on a finding beyond a reasonable doubt of a bribery or kickback scheme.

We conclude that, notwithstanding jury instructions that did not conform to the narrowed scope of honest-services wire fraud under *Skilling*, the appellants cannot satisfy the plain-error standard.

B. *Honest-Services Securities Fraud*

Defendants also assert that the district court committed prejudicial error by including reference to the right to honest services in its jury instructions on the offense of securities fraud under 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5. Once again, because defendants made no timely objection on this ground, we review under the standard of plain error. *See Middlemiss*, 217 F.3d at 121. Although we agree that the court should not have included this concept in the securities fraud charge, it was not reversible error as it did not affect substantial rights or cause injustice. The court's instructions taken as a whole permitted the jury to find the defendants guilty only if the jurors found that the government had proved all the required elements of securities fraud.

The court did tell the jury that "a scheme to defraud" is "a plan to deprive another of money or property, *including the intangible right of honest services,* by trick, deceit, deception,

15

or swindle." Trial Tr. 1617 (emphasis added). Then, in instructing on securities fraud committed by failure to disclose material facts, the court stated that "a fiduciary owes *a duty of honest services* to his or her customer, including a duty to disclose all material facts concerning the transaction entrusted to it." Trial Tr. 1621 (emphasis added). In the same context, the court said that "[a] fiduciary owes *a duty of honest services* to his principal, including a duty to disclose all material facts relevant to an investment decision of the principal." Trial Tr. 1620-21 (emphasis added).

Defendants correctly argue that the concept of deprivation of honest services is not part of the definition of fraud occurring in the securities laws set forth in Title 15 of the United States Code. The statute providing that a "scheme or artifice to defraud" includes a "scheme or artifice to deprive another of the intangible right of honest services" is 18 U.S.C. § 1346, and that provision applies only to offenses specified in chapter 63 of Title 18, including the *wire fraud* charge against the defendants. It has no application to securities fraud offenses defined in Title 15.

Defendants argue that, because of the court's reference to deprivation of honest services, they were deprived of the opportunity to have the jury pass individually on all the necessary elements of securities fraud. As to the scheme to defraud based on the concealment of bribes from the Nouris and Smart Online to brokers to entice the brokers' customers to buy Smart Online stock, apart from the use of the means or instruments of interstate commerce, those elements included whether the omitted facts were material, whether a broker was under a duty to disclose the bribe offer when recommending the purchase, whether the omission was in connection with a purchase or sale of a security, and scienter. *See S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996); *see also Chiarella v. United States*, 445 U.S. 222, 234-

16

35 (1980). As for the scheme to defraud based on fraudulent and misleading representations, the elements were essentially the same, including whether the misrepresentations were material, were made in connection with the purchase or sale of a security, and were made with scienter. *See VanCook v. S.E.C.*, 653 F.3d 130, 138 (2d Cir. 2011); *cf. Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1317-18 (2011) (setting forth elements private 10b-5 plaintiff is required to prove). On the facts of this case, defendants' argument has no force.

The inappropriate references to honest services did not expose the defendants to a risk of conviction without the jury having found the essential elements of the securities fraud crime. It made no practical difference whether the court's instructions presented the issue to the jury under the generalized rubric of employment of a scheme to defraud, a plan to deprive another of money or property by deceit, omission of a material fact necessary in order to make the statements made not misleading, or depriving another of the right to honest services. Each of those formulations can cover infinitely broad possibilities. But the jury was not permitted under the court's instructions to find guilt based on *any* scheme to defraud, depriving another of money by deceit, omission of material fact, or deprivation of honest services. The instructions made clear that, regardless of which of those generalizing rubrics was considered as the umbrella term covering the charges, the court's instructions permitted the jury to find the defendants guilty only if the jurors found beyond a reasonable doubt that the defendants either (1) participated in a scheme for the payment by the Nouris and Smart Online of bribes to the brokers in return for getting their customers to buy Smart Online stock, which the brokers concealed from their customers or (2) participated in a scheme in which brokers made material misrepresentations to their customers when convincing their customers to purchase or purchasing for them Smart Online stock. *See* Trial Tr. 1617:8-1618:4. As to either theory, the court's instructions ensured

17

that the jury could find guilt only upon finding all the essential elements. *See* Trial Tr. 1618:5-1621:22 (fraudulent and misleading representations or failure to disclose facts for which there was a duty to disclose); 1628:18-1629:1 (in connection with a purchase or sale of securities); 1629:19-1630:4 (materiality); 1630:19-1635:19 (scienter).[3]

And even if the reference to deprivation of honest services in connection with a scheme to defraud had made it *theoretically* possible for the jury to find guilt without expressly considering either the materiality of what had been concealed or the question whether the brokers were under a duty to disclose, on the facts of this case there can have been no effect on defendants' substantial rights or a miscarriage of justice—no finding of guilt without satisfaction of the essential elements. If a broker has been bribed by the issuer of a security to get his customers to buy that security, the broker's failure to tell the customer of the fact of the bribe offer while recommending the purchase of the security (or in purchasing for a discretionary account) is, as a matter of law, the omission of a material fact, which the broker is under a duty to reveal. The broker's expectation of a bribe paid by the issuer in exchange for the customer's purchase of the issuer's stock is a piece of information of crucial importance to the customer because the broker's expectation of the bribe strongly suggests that the recommendation is motivated more to benefit the broker than to benefit the customer. At the very least it suggests

---

[3] Defendants also suggest that the securities fraud conviction could not permissibly have rested on conduct outside the scope of the honest-services fraud statute. This argument rests on the erroneous belief that securities fraud under 15 U.S.C. § 10(b) is limited to bribe and kickback schemes like honest-services wire fraud under 18 U.S.C. § 1346. Section 10(b)'s "broad language, on its face, extends to manipulation of all kinds," and Rule 10b-5 "prohibits not only conventional frauds brought about by making materially false or misleading statements, but also so-called 'constructive frauds.'" *United States v. Royer*, 549 F.3d 886, 900 (2d Cir. 2008) (internal citation omitted); *see also Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972) (Section 10(b)'s and Rule 10b-5's proscriptions are "broad" and "obviously meant to be inclusive").

18

the customer should seriously question the genuineness or reliability of the recommendation. (The same is true where the broker exercises discretionary authority to purchase the stock for the customer without needing to make a recommendation.)

Because the concealed fact of the bribes would be of crucial importance to the broker's customer in evaluating the broker's recommendation, that fact is, as a matter of law, a material fact, which the broker is under a duty to disclose. Thus, any possibility the jurors might have reached their guilty verdicts without expressly focusing on the question of the materiality of the fact of the bribe offers, or on the brokers' duty to disclose it to their customers, cannot have affected any defendant's substantial rights or caused a miscarriage of justice.

Defendants further argue that they were prejudiced by the court's instruction to the effect that a broker, if the broker is a fiduciary, "owes a duty of honest services to his or her customer." Trial Tr. 1621:14-15; *see also id.* 1620:25-1621:1. This unwarranted reference to honest services was harmless, however, because the court went on to explain the duty in terms of "a duty to disclose all material facts concerning the transaction entrusted to it," Trial Tr. 1621:15-16; *see also id.* 1-3, which accurately describes the duty of a broker who has a fiduciary relationship or a "similar relation of trust and confidence" with his customer, *see United States v. Szur*, 289 F.3d 200, 211 (2d Cir. 2002) (broker has "a duty to use reasonable efforts to give its principal information relevant to the affairs that have been entrusted to it" (internal quotation marks and citation omitted)). As noted, as a matter of law, the bribe offer in connection with a recommendation is a material fact, which must be disclosed when a broker recommends or purchases a security for a customer.

19

C. *Failure to Instruct on Discretionary vs. Non-Discretionary Accounts*

Defendants also contend, again raising the issue for the first time on appeal, that, in its charge on fraud by failure to disclose, the court erred in failing to explain the significance of the difference between discretionary and non-discretionary accounts, permitting the jury to believe that all brokers had a fiduciary duty to disclose outside compensation to their customers. We find no merit in their argument. The court instructed the jury on the circumstances that make a broker a fiduciary and thus enabled the jurors to distinguish between the circumstances that imposed fiduciary obligations on a broker and those that did not.

D. *"In Connection With" Instruction*

Defendant Martin also argues that the district court erred in its substantive securities fraud instruction by failing to explain to the jury that fraud, which is *merely incidental* to the sale of a security, does not satisfy the requirement of Rule 10b-5 that the fraud be "in connection with" the purchase or sale of a security. We review a district court's refusal to issue requested jury instructions *de novo*. *United States v. Desinor*, 525 F.3d 193, 198 (2d Cir. 2008). In addition to demonstrating that the given instruction was erroneous, where the defendant requested a different instruction than the one actually given, the defendant "bears the burden of showing that the requested instruction accurately represented the law in every respect and that, viewing as a whole the charge actually given, [the defendant] was prejudiced." *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004) (internal quotation marks omitted). We find no error in the court's refusal to so instruct the jury.

The Supreme Court has repeatedly held that Rule 10b-5's requirement that a fraud be "in connection with" the purchase or sale of a security is easily satisfied. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 85 (2006) (emphasizing the "broad interpretation"

20

given to § 10(b)'s and Rule 10b-5's "in connection with" requirement, which is satisfied where the alleged fraud "coincide[s]" with the purchase or sale of securities); *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12-13 (1971) (Section 10(b) regulates deceptive devices "touching" a sale or purchase of a security); *see also S.E.C. v. Zandford*, 535 U.S. 813, 819, 824-25 (2002); *United States v. O'Hagan*, 521 U.S. 642, 655-56 (1997). The district court's instruction was wholly in accordance with the standard set by the Supreme Court and approved by our court. *See Lawrence v. Cohn*, 325 F.3d 141, 154 (2d Cir. 2003); *United States v. Teicher*, 987 F.2d 112, 120 (2d Cir. 1993). While it may not have been error to add the instruction that Martin requested, it was not error to decline to give it.

**II. Sufficiency of the Evidence**

Defendants also challenge their convictions on the ground that there was insufficient evidence to support them. We may overturn the convictions on this basis only if, viewing the evidence in the light most favorable to the government, no "rational trier of fact" could have found that the government established the essential elements of the crimes beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

*A. Securities Fraud - Duty to Disclose to Customers*

Defendants contend the evidence was insufficient to support their securities fraud convictions based on a broker's duty to disclose the bribe offers to their customers. The argument has no merit.

The evidence showed that the brokers, including Martin, were offered and paid substantial bribes for their customers' purchases of Smart Online stock and that in return they recommended Smart Online to customers, with the consequence that the customers purchased the security. In one case, a broker exercised discretionary authority to purchase Smart Online for

21

his customer. With the exception of one customer, the brokers did not disclose the bribes to the customer. Customers to whom recommendations were given testified they relied on those recommendations and would not have purchased Smart Online had they known of the bribes. This evidence amply satisfied all the elements of a criminal violation of Section 10(b) and Rule 10b-5, including the duty to disclose. *See Szur*, 289 F.3d at 211-12 (affirming finding that brokers had duty to disclose payments from company whose stock brokers sold to customers, despite brokers' lack of discretionary authority over their customers' accounts).

*B. Honest-Services Wire Fraud - Duty to Disclose to Employer*

Martin further claims that there was insufficient evidence to establish that he had a duty to disclose to his employer, Maxim, that he was receiving payments from Smart Online in exchange for his customers' purchases of Smart Online stock. We reject this argument.

Sergio, Maxim's Chief Operating Officer in 2005-2007, testified that both the industry rules and Maxim's rules prohibited Maxim's stockbrokers from receiving compensation from the CEO of an issuer of stock in exchange for purchases of that stock by the broker's customers. Maxim's Written Supervisory Procedures required employees to disclose to Maxim and receive approval from the Compliance Department prior to engaging in any outside business activities. Among the examples of outside business activities set forth in the Written Supervisory Procedures was "[r]eceiving other compensation for services rendered outside the scope of employment with the Firm." Joint Appendix at 746. A reasonable jury could have concluded that Martin's acceptance of the bribe payments from the Nouris in exchange for selling Smart Online stock to his customers was "[r]eceiving other compensation for services rendered outside the scope of employment with the Firm" or another form of outside business activity, especially in light of Sergio's testimony that such actions were outside business activity. Furthermore, Park,

the government's industry expert, testified that FINRA rules required brokers to disclose to and receive approval from their brokerage firm prior to doing anything outside the normal scope of their brokerage responsibilities and, more specifically, that FINRA rules required brokers to disclose to their employer if an officer or director of a public company paid the broker to solicit customers. Maxim's Written Supervisory Procedures incorporated industry standards. This evidence was more than sufficient to demonstrate that Martin had a duty to disclose to his employer the payments he received from the Nouris.

**III. Restriction of Martin's Examination of Robert Richardson**

Martin argues the district court erroneously restricted his examination of Reverend Robert Richardson, Martin's friend and former colleague who purchased Smart Online stock on Martin's recommendation, by not allowing Richardson to testify, based on his experience working in a brokerage firm with Martin twenty years earlier, about his familiarity with the "broker's special of the day" practice and about Martin's professionalism and honesty in recommending stocks to customers. We review a district court's evidentiary rulings for abuse of discretion. *United States v. White*, 692 F.3d 235, 244 (2d Cir. 2012). We find no such abuse here.

The district court was well within its discretion in finding that Richardson's proffered testimony that another brokerage firm twenty years earlier had paid to brokers bonus commissions that were not disclosed to customers was not relevant to Martin's state of mind when he accepted payments from Smart Online to sell Smart Online stock to his customers. And, because Richardson was not qualified as an expert witness about brokerage firm practices, the district court correctly ruled that he could not properly testify that "specials of the day" were routine practices in the industry. Moreover, Richardson's testimony would have been merely cumulative of Gardner's testimony that Maxim sometimes paid these types of bonus commissions, which were not disclosed to customers.

23

Similarly, Martin's proffer to elicit from Richardson whatever Martin had told him twenty years earlier about recommending stocks to customers while Martin was mentoring Richardson was so remote that it clearly was within the court's discretion to exclude it. Accordingly, the district court did not abuse its discretion in limiting Richardson's testimony.

**IV. Reasonableness of Martin's Sentence**

Martin also argues that his sentence was substantively and procedurally unreasonable, especially in light of the disparity between Martin's sentence and those of the other defendants, who all received below-Guidelines sentences, and because he should have received a three-point reduction in his Guidelines calculation for acceptance of responsibility.

We review a district court's sentencing determination for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 41 (2007); *accord United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). A sentence must be both procedurally and substantively reasonable. *Cavera*, 550 F.3d at 189. A district court commits procedural error if it "fails to calculate the Guidelines range . . . , makes a mistake in its Guidelines calculation, or treats the Guidelines as mandatory" or if it "does not consider the § 3553(a) factors, or rests its sentence on a clearly erroneous finding of fact," or "fails adequately to explain its chosen sentence." *Id.* at 190 (citation omitted). We will set aside a district court's substantive determination "only in exceptional cases where the trial court's decision cannot be located within the range of permissible decisions." *Id.* at 189 (internal quotation marks and citation omitted).

Martin contends that the district court erred procedurally by not granting Martin a reduction to his Guidelines calculation for acceptance of responsibility under U.S.S.G. § 3E1.1. Recognizing that a district court's determination whether a defendant is entitled to credit for

24

acceptance of responsibility merits "great deference" because the "sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility," *id.* cmt. 5, and that it should be upheld unless it is "without foundation," *United States v. Taylor*, 475 F.3d 65, 68 (2d Cir. 2007) (internal quotation marks omitted), we conclude that the district court did not err.

Under Section 3E1.1 of the Sentencing Guidelines, a defendant may receive a downward adjustment "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). The commentary explains that "[t]his adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse," unless the defendant "goes to trial to assert and preserve issues that do not relate to factual guilt." *Id.* cmt. 2.

Martin contends he contested only legal conclusions and not any underlying facts. This is not correct. Martin contested his guilt by arguing to the jury in summation that he lacked any intent to defraud his customers and recommended Smart Online in good faith. The district court had a reasonable basis for rejecting Martin's request for an acceptance of responsibility reduction.

Martin also argues that his sentence is unreasonable because all of his co-defendants, and in particular brokers Lustig and Serrano, who he contends were similarly situated, received below-Guidelines sentences. He points to Section 3553(a)(6), which requires that the court consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

25

There is no reason to believe the district court did not consider the need to avoid unwarranted disparities among similarly-situated defendants. To the contrary, the court expressly considered the question and found that the co-defendants were not similarly situated. Both Lustig and Serrano had admitted that what they did was wrong and illegal and apologized to the victims, whereas Martin had not. There is no merit to Martin's claim that his sentence is not substantively reasonable.

**CONCLUSION**

For the reasons stated above, the district court's judgments are affirmed.