14-3599
*United States v. Martoma*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2016

(Argued: October 28, 2015 and May 9, 2017          Decided: August 23, 2017)

Docket No. 14-3599

_____

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

MATHEW MARTOMA

*Defendant-Appellant.*

_____

B e f o r e:

KATZMANN, *Chief Judge*, POOLER and CHIN, *Circuit Judges*.

_____

Defendant-appellant Mathew Martoma appeals from a judgment of conviction entered on September 9, 2014 in the United States District Court for the Southern District of New York (Gardephe, *J.*). Martoma was found guilty, after a jury trial, of one count of conspiracy to commit securities fraud in violation of 18 U.S.C. § 371 and two counts of securities fraud in violation of 15 U.S.C. §§ 78j(b) & 78ff in connection with an insider trading scheme. After Martoma was convicted, this Court issued a decision in *United States v. Newman*, 773 F.3d 438 (2d Cir. 2014), which elaborated on the Supreme Court's ruling in *Dirks v. S.E.C.*, 463 U.S. 646 (1983), concerning liability for a "tippee" who trades on confidential information obtained from an insider, or a "tipper." *Newman* concluded that the "personal benefit" that a tipper must derive from providing inside information for a disclosure to trigger insider trading liability could not be inferred under the "gift theory" articulated in *Dirks* "in the absence of proof of a meaningfully close personal relationship [between the tipper and tippee] that generates an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature." *Newman*, 773 F.3d at 452.

Martoma initially argued on appeal that the jury in his case had not been properly instructed and that the evidence presented at his trial was insufficient to convict him in light of *Newman*. While Martoma's appeal was pending, the Supreme Court issued a decision in *Salman v. United States*, 137 S. Ct. 420 (2016), which rejected certain aspects of *Newman*'s holding. *Id*. at 428. In supplemental briefing, Martoma argues that his conviction should still be reversed under *Newman* because *Salman* did not overrule *Newman*'s requirement that a tipper have a "meaningfully close personal relationship" with a tippee to justify the inference that a tipper received a personal benefit from his gift of inside information. *Newman*, 773 F.3d at 452.

We conclude that the logic of *Salman* abrogated *Newman*'s "meaningfully close personal relationship" requirement and that the district court's jury instruction was not obviously erroneous. Further, any instructional error would not have affected Martoma's substantial rights because the government presented overwhelming evidence that at least one tipper received a financial benefit from providing confidential information to Martoma. Accordingly, the judgment of the district court is **AFFIRMED**.

POOLER, *Circuit Judge*, dissents in a separate opinion.

_____

ROBERT ALLEN and ARLO DEVLIN-BROWN, Assistant United States Attorneys, (Megan Gaffney, Michael A. Levy, and Margaret Garnett, Assistant United States Attorneys, *on the brief*), *for* Joon H. Kim, Acting United States Attorney for the Southern District of New York, New York, NY, *for Appellee*.

PAUL D. CLEMENT (Erin E. Murphy, Harker Rhodes, and Edmund G. LaCour, Jr., *on the brief*), Kirkland & Ellis LLP, Washington, DC; Alexandra A.E. Shapiro, Eric S. Olney, and Jeremy Licht, Shapiro Arato LLP, New York, NY; Charles J. Ogletree, Jr., Cambridge, MA, *for Defendant-Appellant*.

_____

KATZMANN, *Chief Judge*:

Defendant-appellant Mathew Martoma was convicted, following a four-week jury trial, of one count of conspiracy to commit securities fraud in violation of 18 U.S.C. § 371 and two counts of securities fraud in violation of 15 U.S.C. §§ 78j(b) & 78ff in connection with an insider trading scheme. Martoma argues primarily that the evidence presented at trial was insufficient to support his conviction and that the district court did not properly instruct the jury in light of the Second Circuit's decision in *United States v. Newman*, 773 F.3d 438 (2d Cir. 2014), issued after Martoma was convicted. This appeal is our first occasion to consider *Newman* in the aftermath of the Supreme Court's recent decision in *Salman v. United States*, 137 S. Ct. 420 (2016). We hold that the logic of *Salman*

abrogated *Newman*'s "meaningfully close personal relationship" requirement and that the district court's jury instruction was not obviously erroneous. Further, any instructional error would not have affected Martoma's substantial rights because the government presented overwhelming evidence that at least one tipper received a financial benefit from providing confidential information to Martoma. As a result, we **AFFIRM** the judgment of the district court.

## BACKGROUND

## I.

Martoma's convictions stem from an insider trading scheme involving securities of two pharmaceutical companies, Elan Corporation, plc ("Elan") and Wyeth, that were jointly developing an experimental drug called bapineuzumab to treat Alzheimer's disease. Martoma worked as a portfolio manager at S.A.C. Capital Advisors, LLC ("SAC"), a hedge fund owned and managed by Steven A. Cohen. In that capacity, Martoma managed an investment portfolio with buying power of between $400 and $500 million that was focused on pharmaceutical and healthcare companies. He also recommended investments to Cohen, who managed SAC's largest portfolio. While at SAC, Martoma began to acquire

shares in Elan and Wyeth in his portfolio and recommended that Cohen acquire

shares in the companies as well.

In order to obtain information about bapineuzumab, Martoma contacted

expert networking firms and arranged paid consultations with doctors

knowledgeable about Alzheimer's disease, including two who were working on

the bapineuzumab clinical trial. Dr. Sidney Gilman, chair of the safety

monitoring committee for the bapineuzumab clinical trial, participated in

approximately 43 consultations with Martoma at the rate of around $1,000 per

hour.[1]  As a member of the safety monitoring committee, Dr. Gilman had an

obligation to keep the results of the clinical trial confidential. His consulting

contract reiterated that he was not to disclose any confidential information in a

consultation. He nevertheless provided Martoma, whom he knew was an

investment manager, with confidential updates on the drug's safety that he

received during meetings of the safety monitoring committee. Dr. Gilman also

shared with Martoma the dates of upcoming safety monitoring committee

---

[1] Martoma did not pay Dr. Gilman or any other consultant directly. Instead, SAC would pay the expert networking firm, and the expert networking firm would in turn pay Dr. Gilman and the other consultants.

meetings, which allowed Martoma to schedule consultations with Dr. Gilman shortly after each one. Another consultant, Dr. Joel Ross, one of the principal investigators on the clinical trial, met with Martoma on many occasions between 2006 and July 2008 and charged approximately $1,500 per hour. Like Dr. Gilman, Dr. Ross had an obligation to maintain the confidentiality of information about the bapineuzumab clinical trial. Nevertheless, during their consultations, Dr. Ross provided Martoma with information about the clinical trial, including information about his patients' responses to the drug and the total number of participants in the study, that Dr. Ross recognized was not public.

On June 17, 2008, Elan and Wyeth issued a press release regarding the results of "Phase II" of the bapineuzumab clinical trial. The press release described the preliminary results as "encouraging," with "clinically meaningful benefits in important subgroups" of Alzheimer's patients with certain genetic characteristics, but indicated that the drug had not proven effective in the general population of Alzheimer's patients. J.A. 547. The press release further stated that the results of the trials would be presented in greater detail at the International Conference on Alzehimer's Disease to be held on July 29, 2008. Elan's share price increased following the press release.

In mid-July of 2008, the sponsors of the bapineuzumab trial selected Dr. Gilman to present the results at the July 29 conference. It was only at this point that Dr. Gilman was unblinded as to the final efficacy results of the trial. Dr. Gilman was "initially euphoric" about the results, but identified "two major weaknesses in the data" that called into question the efficacy of the drug as compared to the placebo. Tr. 1419–20. On July 17, 2008, the day after being unblinded to the results, Dr. Gilman spoke with Martoma for about 90 minutes by telephone about what he had learned. That same day, Martoma purchased a plane ticket to see Dr. Gilman in person at his office in Ann Arbor, Michigan. That meeting occurred two days later, on July 19, 2008. At that meeting, Dr. Gilman showed Martoma a PowerPoint presentation containing the efficacy results and discussed the data with him in detail.

The next morning, Sunday, July 20, Martoma sent Cohen, the owner of SAC, an email with "It's important" in the subject line and asked to speak with him by telephone. The two had a telephone conversation lasting about twenty minutes, after which Martoma emailed Cohen a summary of SAC's Elan and Wyeth holdings. The day after Martoma spoke to Cohen, on July 21, 2008, SAC

began to reduce its position in Elan and Wyeth securities by entering into short-sale and options trades that would be profitable if Elan's and Wyeth's stock fell.

Dr. Gilman publicly presented the final results from the bapineuzumab trial at the International Conference on Alzehimer's Disease in the afternoon of July 29, 2008. Elan's share price began to decline during Dr. Gilman's presentation and at the close of trading the next day, the share prices of Elan's and Wyeth had declined by about 42% and 12%, respectively. The trades that Martoma and Cohen made in advance of the announcement resulted in approximately $80.3 million in gains and $194.6 million in averted losses for SAC. Martoma personally received a $9 million bonus based in large part on his trading activity in Elan and Wyeth.

## II.

The procedural history of this case is inextricably intertwined with recent developments in insider trading law. Insider trading is a violation of § 10(b) of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78j(b), and Rule 10b-5, promulgated by the Securities and Exchange Commission ("SEC") and codified at 17 C.F.R. § 240.10b-5. The Supreme Court has long held that there is no "general duty between all participants in market transactions to forgo actions

8

based on material, nonpublic information." *Chiarella v. United States*, 445 U.S. 222, 233 (1980). However, the "traditional" or "classical theory" of insider trading provides that a corporate insider violates § 10(b) and Rule 10b-5 when he "trades in the securities of his corporation on the basis of material, non-public information" because "a relationship of trust and confidence [exists] between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation." *United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997) (alteration in original) (quoting *Chiarella*, 445 U.S. at 228). Similarly, the "misappropriation theory" of insider trading provides "that a person . . . violates § 10(b) and Rule 10b-5[] when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information." *Id*. at 652. It is thus the breach of a fiduciary duty or other "duty of loyalty and confidentiality" that is a necessary predicate to insider trading liability. *See id*.

In *Dirks v. S.E.C.*, 463 U.S. 646 (1983), the Supreme Court held that a "tippee"—someone who is not a corporate insider but who nevertheless receives material nonpublic information from a corporate insider, or "tipper," and then trades on the information—can also be held liable under § 10(b) and Rule 10b-5,

9

but "only when the insider has breached his fiduciary duty to the shareholders by disclosing the information to the tippee and the tippee knows or should know that there has been a breach." *Id.* at 660.[2] "[T]he test" for whether there has been a breach of a fiduciary duty or other duty of loyalty and confidentiality "is whether the [tipper] personally will benefit, directly or indirectly, from his disclosure" to the tippee. *Dirks*, 463 U.S. at 662. As examples of "direct or indirect personal benefit[s] from the disclosure," the Supreme Court cited "pecuniary gain or a reputational benefit that will translate into future earnings." *Id*. at 663. The Supreme Court went on to list "objective facts and circumstances that often justify" an inference of personal benefit:

> For example, there may be a relationship between the insider and the recipient that suggests a *quid pro quo* from the latter, or an intention to benefit the particular recipient. The elements of fiduciary duty and exploitation of nonpublic information also exist when an insider makes a gift of confidential information to a trading relative or friend. The tip and trade resemble trading by the insider himself followed by a gift of the profits to the recipient.

---

[2] Although many of the cases refer to "insiders" and "fiduciary" duties because those cases involve the "classical theory" of insider trading, the *Dirks* articulation of tipper and tippee liability also applies under the misappropriation theory, where the misappropriator violates some duty owed to the source of the information. *See S.E.C. v. Obus*, 693 F.3d 276, 286–88 (2d Cir. 2012); *see also Newman*, 773 F.3d at 445–46.

10

*Id*. at 664. Building on this language, we have observed that "[p]ersonal benefit is broadly defined to include not only pecuniary gain, but also, *inter alia*, any reputational benefit that will translate into future earnings and the benefit one would obtain from simply making a gift of confidential information to a trading relative or friend." *United States v. Jiau*, 734 F.3d 147, 153 (2d Cir. 2013) (alterations, citations, and internal quotation marks omitted).

Accordingly, the district court instructed the jury in Martoma's trial that:

> If you find that Dr. Gilman or Dr. Ross disclosed material, non-public information to Mr. Martoma, you must then determine whether the government proved beyond a reasonable doubt that Dr. Gilman and Dr. Ross received or anticipated receiving some personal benefit, direct or indirect, from disclosing the material, non-public information at issue.
>
> The benefit may, but need not be, financial or tangible in nature; it could include obtaining some future advantage, developing or maintaining a business contact or a friendship, or enhancing the tipper's reputation.
>
> A finding as to benefit should be based on all the objective facts and inferences presented in the case. You may find that Dr. Gilman or Dr. Ross received a direct or indirect personal benefit from providing inside information to Mr. Martoma if you find that Dr. Gilman or Dr. Ross gave the information to Mr. Martoma with the intention of benefit[t]ing themselves in some

manner, or with the intention of conferring a benefit on Mr. Martoma, or as a gift with the goal of maintaining or developing a personal friendship or a useful networking contact.

Tr. 3191.

After Martoma was convicted and while his appeal was pending, we considered one of the situations described in *Dirks*—giving a "gift" of inside information to "a trading relative or friend"—in greater detail in *United States v. Newman*, 773 F.3d 438 (2d Cir. 2015). The Court noted "that [p]ersonal benefit is broadly defined." *Id*. at 452 (quoting *Jiau*, 734 F.3d at 153) (internal quotation marks omitted). The Court went on, however, to state:

> This standard, although permissive, does not suggest that the Government may prove the receipt of a personal benefit by the mere fact of a friendship, particularly of a casual or social nature. If that were true, and the Government was allowed to meet its burden by proving that two individuals were alumni of the same school or attended the same church, the personal benefit requirement would be a nullity. To the extent *Dirks* suggests that a personal benefit may be inferred from a personal relationship between the tipper and tippee, where the tippee's trades 'resemble trading by the insider himself followed by a gift of the profits to the recipient,' we hold that such an inference is impermissible in the absence of proof of a meaningfully close personal relationship that generates an exchange that is objective, consequential, and represents at least a

12

> potential gain of a pecuniary or similarly valuable
> nature.

*Id*. at 452 (citation omitted).

Based on this language from *Newman*, Martoma challenged on appeal both the sufficiency of the evidence presented at his trial and the adequacy of the instructions given to the jury. Martoma argued that he and Dr. Gilman did not have a "meaningfully close personal relationship" and that Dr. Gilman had not received any "objective, consequential . . . gain of a pecuniary or similarly valuable nature" in exchange for providing Martoma with confidential information.[3] Further, according to Martoma, even if the evidence was sufficient to support his conviction, the district court's jury instructions were inadequate in light of *Newman* because they did not inform the jury about the limitations on "personal benefit" developed in *Newman*. This inadequate instruction, Martoma argued, warranted a retrial. The initial round of briefing and oral argument focused in large part on whether Martoma's conviction could stand in light of *Newman*.

---

[3] The parties focus primarily on Dr. Gilman because it was Dr. Gilman, not Dr. Ross, who gave Martoma the final efficacy data that led Martoma to reduce SAC's position in Elan and Wyeth.

Shortly after we held oral argument, however, the Supreme Court granted

certiorari in *Salman v. United States*, *see* 136 S. Ct. 899 (2016), and issued a decision

in the case on December 6, 2016. *See* 137 S. Ct. 420 (2016). The defendant in

*Salman* argued that a "gift of confidential information to a trading relative or

friend," *id*. at 426 (quoting *Dirks*, 463 U.S. at 664), was insufficient to establish

insider trading liability "unless the tipper's goal in disclosing inside information

[wa]s to obtain money, property, or something of tangible value." *Id*. In other

words, the defendant in *Salman* urged the Supreme Court to adopt a standard

similar to the ruling in *Newman*. The Supreme Court declined to do so and

instead "adhere[d] to *Dirks*," which contained a "discussion of gift giving [that]

resolve[d] the case." *Id*. at 427. According to the *Salman* Court:

> *Dirks* specifies that when a tipper gives inside
> information to "a trading relative or friend," the jury
> can infer that the tipper meant to provide the equivalent
> of a cash gift. In such situations, the tipper benefits
> personally because giving a gift of trading information
> is the same thing as trading by the tipper followed by a
> gift of the proceeds. Here, by disclosing confidential
> information as a gift to his brother with the expectation
> that he would trade on it, [the tipper] breached his duty
> of trust and confidence to [his employer] and its
> clients—a duty [the defendant] acquired, and breached
> himself, by trading on the information with full
> knowledge that it had been improperly disclosed.

14

*Id*. at 428. The Supreme Court also mentioned the *Newman* decision, observing that "[t]o the extent the Second Circuit held that the tipper must also receive something of a 'pecuniary or similarly valuable nature' in exchange for a gift to family or friends, . . . this requirement is inconsistent with *Dirks*." *Id*. (quoting *Newman*, 773 F.3d at 452).

In light of *Salman*, we requested additional briefing from the parties and scheduled a second round of oral argument to address how *Salman* affects this case.

## DISCUSSION

As noted above, Martoma challenges both the sufficiency of the evidence presented at trial and the adequacy of the district court's jury instruction. A defendant challenging the sufficiency of the evidence "bears a heavy burden," and "the standard of review is exceedingly deferential." *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012) (citations and internal quotation marks omitted). "In evaluating a sufficiency challenge, we 'must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence.'" *Id*.

(quoting *United States v. Chavez*, 549 F.3d 119, 124 (2d Cir. 2008)). "Although sufficiency review is *de novo*, we will uphold the judgment[] of conviction if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (citation omitted). "A judgment of acquittal is warranted only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Jiau*, 734 F.3d 147, 152 (2d Cir. 2013) (alterations and internal quotation marks omitted).

With respect to Martoma's challenge to the district court's jury instruction, "[w]e review a jury charge in its entirety and not on the basis of excerpts taken out of context." *United States v. Mitchell*, 328 F.3d 77, 82 (2d Cir. 2003) (quoting *United States v. Zvi*, 168 F.3d 49, 58 (2d Cir. 1998)). "A conviction based on a general verdict is subject to challenge if the jury was instructed on alternative theories of guilt and may have relied on an invalid one." *Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008). Such a challenge, however, is subject to harmless error review. *See id*. at 58, 61–62. And because Martoma raises his challenge to the jury instruction for the first time on appeal, we review only for plain error. *United*

*States v. Vilar*, 729 F.3d 62, 70 (2d Cir. 2013). Under the plain error standard, an appellant must demonstrate that "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights . . . ; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings."[4] *United States v. Marcus*, 560 U.S. 258, 262 (2010) (internal quotation marks and alteration omitted). "[W]e look not to the law at the time of the trial court's decision to assess whether the error was plain, but rather, to the law as it exists at the time of review." *Vilar*, 729 F.3d at 71. Even with respect to an instructional error that "incorrectly omitted an element of the offense," we will not overturn a conviction "if we find that the jury would have returned the same verdict beyond a reasonable doubt," and thus that "the error did not affect [the defendant's] substantial rights." *United*

---

[4] In the past, we have stated that "[w]here . . . the source of an alleged jury instruction error is a supervening decision, we employ a 'modified plain-error rule, under which the government, not the defendant, bears the burden to demonstrate that the error . . . was harmless.'" *United States v. Mahaffy*, 693 F.3d 113, 136 (2d Cir. 2012). We have "on at least twenty-two occasions," *Vilar*, 729 F.3d at 71 n.5, observed that the Supreme Court's decision in *Johnson v. United States*, 520 U.S. 461 (1997) "called into question the modified plain error standard of review." *United States v. Botti*, 711 F.3d 299, 308 (2d Cir. 2013). Here, as in the past, "[b]ecause we would reach the same conclusion under either standard, we need not resolve that question." *United States v. Nouri*, 711 F.3d 129, 138 n.2 (2d Cir. 2013).

*States v. Nouri*, 711 F.3d 129, 139–140 (2d Cir. 2013) (internal quotation marks omitted).

## I.

We first evaluate Martoma's sufficiency challenge. In *Newman*, the Court noted that "the tipper's gain need not be *immediately* pecuniary," and, invoking *United States v. Jiau*, 734 F.3d 147 (2d Cir. 2013), explained that "enter[ing] into a relationship of *quid quo pro* with [a tippee], and therefore ha[ving] the opportunity to . . . yield future pecuniary gain," constituted a personal benefit giving rise to insider trading liability. *Newman*, 773 F.3d at 452. That is exactly what happened in this case. Martoma was a frequent and lucrative client for Dr. Gilman, who was paid $1,000 per hour for approximately 43 consultation sessions. At the same time, Dr. Gilman was regularly feeding Martoma confidential information about the safety results of clinical trials involving bapineuzumab. And when Dr. Gilman gained access to the final clinical study efficacy data in July 2008, he immediately passed it along to Martoma. It is true that Dr. Gilman did not bill Martoma specifically for the July 17 and 19, 2008 meetings at which Dr. Gilman provided Martoma with the efficacy data—because, as he admitted at trial, doing so "would [have been] tantamount to

18

confessing that [he] was . . . giving [Martoma] inside information." Tr. 1918. But in the context of their ongoing "relationship of *quid pro quo*," *Newman*, 773 F.3d at 452, where Dr. Gilman regularly disclosed confidential information in exchange for fees, "a rational trier of fact could have found the essential elements of the crime [of insider trading] beyond a reasonable doubt" under a pecuniary *quid pro quo* theory. *Coplan*, 703 F.3d at 62 (quoting *Jackson*, 443 U.S. at 319).

## II.

Because the evidence presented at trial was sufficient to sustain Martoma's conviction, we turn next to his challenge to the district court's jury instruction. His argument on this front focuses on the theory, originating in *Dirks*, that the personal benefit necessary to establish insider trading liability in a tipping case can be inferred from a gift of inside information "to a trading relative or friend." *See Dirks*, 463 U.S. at 663–64; *Salman*, 137 S. Ct. at 428. As noted above, *Newman* held that this inference was "impermissible in the absence of proof of a meaningfully close personal relationship." 773 F.3d at 452. Martoma argues that this requirement survives the Supreme Court's decision in *Salman* and that the jury was not properly instructed on it. Following the logic of the Supreme Court's reasoning in *Salman*, interpreting *Dirks*, we think that *Newman*'s

19

"meaningfully close personal relationship" requirement can no longer be

sustained.

## A.

The Supreme Court explained in *Dirks* that a tippee who knowingly trades

on material nonpublic information obtained from an insider does not necessarily

violate insider trading law. *See* 463 U.S. at 658–59. But "[t]he conclusion that

recipients of inside information do not invariably acquire a duty to disclose or

abstain does not mean that such tippees always are free to trade on the

information." *Id*. at 659. Instead, "the tippee's duty to disclose or abstain is

derivative from that of the insider's duty." *Id*. at 659. "Thus, some tippees must

assume an insider's duty to the shareholders not because they receive inside

information, but rather because it has been made available to them *improperly*."

*Id*. at 660 (emphasis in original). As a result, "a tippee assumes a fiduciary duty

. . . not to trade on material nonpublic information only when the insider has

breached his fiduciary duty . . . by disclosing the information to the tippee and

the tippee knows or should know that there has been a breach." *Id*. at 660.

*Dirks* further observed that "[w]hether disclosure is a breach of duty . . .

depends in large part on the purpose of the disclosure," namely "whether the

20

insider personally will benefit, directly or indirectly, from his disclosure,"

because "[a]bsent some personal gain, there has been no breach of duty to

stockholders." 463 U.S. at 662; *see also id*. at 659 ("[Tippers] may not give [inside]

information to an outsider for the . . . improper purpose of exploiting the

information for their personal gain."). In the context of this discussion, *Dirks* gave

several examples of situations in which an insider would personally benefit from

disclosing inside information: disclosing inside information in a *quid pro quo*

relationship, disclosing inside information with "an intention to benefit the

particular recipient," and disclosing inside information as "a gift . . . to a trading

relative or friend." *Id*. at 664. Contrary to the dissent's claim, *see* Dissent Slip Op.

at 23, this discussion did not purport to *limit* to these examples the situations in

which a personal benefit can be inferred; the broader inquiry underlying the

examples remained "whether the insider personally will benefit, directly or

indirectly, from his disclosure." *Id*. at 662.[5]

---

[5] The fact that *Dirks* held that the tipper's intent to give a benefit to the tippee was an example of a personal benefit to the *tipper* illustrates just how broadly the Court defined the concept of personal benefit to the tipper.

*Newman*, however, did view these examples as limiting the situations in which a personal benefit could be inferred. As relevant to this case, *Newman* held that the jury was *never* permitted to infer that a tipper had personally benefitted from disclosing inside information as a gift unless that gift was made to someone with whom the tipper had "a meaningfully close personal relationship," 773 F.3d at 452, seeking to give definition to the "friend" language from *Dirks*.[6] But in evaluating this gloss on *Dirks*, it is critical to keep in mind that the ultimate inquiry under *Dirks* is whether a tipper has personally benefitted from a disclosure of inside information such that he has violated his fiduciary duty, and it is not apparent that the examples in *Dirks* support a categorical rule that an insider can never benefit personally from gifting inside information to people other than "meaningfully close" friends or family members—especially because the justification for construing gifts as involving a personal benefit is that "[t]he tip and trade resemble trading by the insider himself followed by a gift of the

---

[6] The "meaningfully close personal relationship" requirement was paired, moreover, with the additional requirement that the relationship "generate[] an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature." 773 F.3d at 452. The dissent concedes that *Salman* expressly rejected the latter part of this pairing, *See* Dissent Slip Op. at 18.

profits to the recipient," *Dirks*, 463 U.S. at 664, an observation that holds true even if the tipper and tippee were, for example, business school classmates who "had known each other for years" rather than "close friends." *See Newman*, 773 F.3d at 452 (internal quotation marks omitted).

**B.**

Despite some tension between *Newman* and *Dirks*, "it would ordinarily be neither appropriate nor possible for [a panel] to reverse an existing Circuit precedent." *Shipping Corp. of India v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58, 67 (2d Cir. 2009). However, "a three-judge panel may issue an opinion that overrules Circuit precedent . . . where an intervening Supreme Court decision casts doubt on the prior ruling." *Doscher v. Sea Port Grp. Sec., LLC*, 832 F.3d 372, 378 (2d Cir. 2016) (internal quotation marks omitted). The Supreme Court's decision in *Salman* explicitly rejected certain aspects of *Newman*. *See* 137 S. Ct. at 428. While the Supreme Court did not have occasion to expressly overrule *Newman*'s requirement that the tipper have a "meaningfully close personal relationship" with a tippee to justify the inference that a tipper received a personal benefit from his gift of inside information—because that aspect of *Newman* was not at issue in *Salman*—"[e]ven if the effect of a Supreme Court decision is 'subtle,' it

23

may nonetheless alter the relevant analysis fundamentally enough to require overruling prior, 'inconsistent' precedent." *Doscher*, 832 F.3d at 378 (quoting *Wojchowski v. Daines*, 498 F.3d 99, 108 (2d Cir. 2007)).

We respectfully conclude that *Salman* fundamentally altered the analysis underlying *Newman*'s "meaningfully close personal relationship" requirement such that the "meaningfully close personal relationship" requirement is no longer good law. In a case involving a tipper and tippee who were brothers, *Salman* found it "obvious" that an insider would personally benefit from "trad[ing] on [inside] information . . . himself and then giv[ing] the proceeds as a gift to his brother." 137 S. Ct. at 427–28. And *Salman* observed that an insider "effectively achieve[s] the same result by disclosing the information to [the tippee], and allowing him to trade on it," because "giving a gift of [inside] information is the same thing as trading by the tipper followed by a gift of the proceeds." *Id*. at 428; *see also id*. ("Making a gift of inside information to a relative . . . is little different from trading on the information, obtaining the profits, and doling them out . . . ."). For this reason, *Salman* cited *Dirks*'s observation that "'insiders [are] forbidden' both 'from personally using undisclosed corporate information to their advantage' and from 'giv[ing] such information to an

24

outsider for the same improper purpose of exploiting the information for their personal gain.'" *Id*. (quoting *Dirks*, 463 U.S. at 659) (alterations in original).

It is true that *Dirks* and *Salman* largely confine their discussion of gifts to "trading relative[s] and friend[s]," and, as indicated earlier, *Salman* did not specifically hold that gifts to anyone, not just relatives and friends, give rise to the personal benefit needed to establish insider trading liability (presumably because *Salman* involved tips between brothers, comfortably within the "trading relative" language of *Dirks*). However, the straightforward logic of the gift-giving analysis in *Dirks*, strongly reaffirmed in *Salman*, is that a corporate insider personally benefits whenever he "disclos[es] inside information as a gift . . . with the expectation that [the recipient] would trade" on the basis of such information or otherwise exploit it for his pecuniary gain. *Salman*, 137 S. Ct. at 428. That is because such a disclosure is the functional equivalent of trading on the information himself and giving a cash gift to the recipient. Nothing in *Salman*'s reaffirmation of this logic supports a distinction between gifts to people with whom a tipper shares a "meaningfully close personal relationship"—a term left undefined in *Newman*, but which apparently did not reach two people who "had known each other for years, having both attended business school and worked

. . . together," 773 F.3d at 452—and gifts to those with whom a tipper does not share such a relationship. If the insider discloses inside information "with the expectation that [the recipient] would trade on it," *Salman*, 137 S. Ct. at 428, and the disclosure "resemble[s] trading by the insider followed by a gift of the profits to the recipient," *id*. at 427 (quoting *Dirks*, 463 U.S. at 664), he personally benefits for the reasons described in *Dirks* and *Salman*.[7] Indeed, *Dirks* seems to have at least implicitly shared this understanding: Although the tippee in *Dirks* did not have a personal relationship of any kind, let alone a friendship, with the tippers who gave him inside information, the Supreme Court applied the gift theory to his case. *See Dirks*, 463 U.S. at 648–49, 667 ("[N]or was [the tippers'] purpose to make a gift of valuable information to Dirks."); *see also Salman*, 137 S. Ct. at 427

---

[7] The dissent posits that some benefits from gift-giving might be unique to close friendships and family relationships. *See* Dissent Slip Op. at 28–29. Notably, none of these benefits bear any relation to the Supreme Court's articulation of why giving a gift to a "trading relative or friend" involves a personal benefit to the gift-giver. The Supreme Court did not, for example, say that an insider benefits personally from making friends and family members happy, or from improving relationships, or from the potential of using the gift in the future. Instead, the Supreme Court observed that giving a gift of inside information personally benefits the insider because the gift is the equivalent of trading on the tip oneself—an obvious pecuniary benefit—and giving a gift of the proceeds. In light of this articulated logic, the dissent's claim that "[i]t is not entirely straightforward that *giving* a gift provides the gift-giver with a benefit," *see* Dissent Slip Op. at 11, is not persuasive.

26

("We then applied this gift-giving principle to resolve *Dirks* itself . . . ."). This approach makes sense in light of the Supreme Court's observation that "'insiders [are] forbidden' both 'from personally using undisclosed corporate information to their advantage' and from 'giv[ing] such information to an outsider for the same improper purpose of exploiting the information for their personal gain'" — a statement not limited by the relationships of the parties. *See Salman*, 137 S. Ct. at 428 (quoting *Dirks*, 463 U.S. at 659) (alterations in original).

An example illustrates the point. Imagine that a corporate insider, instead of giving a cash end-of-year gift to his doorman, gives a tip of inside information with instructions to trade on the information and consider the proceeds of the trade to be his end-of-year gift.  In this example, there may not be a "meaningfully close personal relationship" between the tipper and tippee, yet this clearly is an illustration of prohibited insider trading, as the insider has given a tip of valuable inside information in lieu of a cash gift and has thus personally benefitted from the disclosure.

Thus, we hold that an insider or tipper personally benefits from a disclosure of inside information whenever the information was disclosed "with the expectation that [the recipient] would trade on it," *Salman*, 137 S. Ct. at 428,

27

and the disclosure "resemble[s] trading by the insider followed by a gift of the profits to the recipient," *id*. at 427 (quoting *Dirks*, 463 U.S. at 664), whether or not there was a "meaningfully close personal relationship" between the tipper and tippee.[8] The dissent criticizes us for "holding that someone who gives a gift *always* receives a personal benefit from doing so" and that "an insider receives a personal benefit when the insider gives inside information as a 'gift' to *any* person." Dissent Slip Op. at 2. But our holding reaches only the insider who discloses inside information to someone *he expects will trade on the information*. This holding is no broader than the logic underpinning the Supreme Court's conclusion in *Salman*. Indeed, as noted above, the Supreme Court has found it

---

[8] Although we hold that *Newman*'s "meaningfully close personal relationship" *requirement* is no longer good law, we do not hold that the relationship between the tipper and tippee cannot be relevant to the jury in assessing competing narratives as to whether information was disclosed "with the expectation that [the recipient] would trade on it," *Salman*, 137 S. Ct. at 428, and whether the disclosure "resemble[d] trading by the insider followed by a gift of the profits to the recipient," *id*. at 427 (quoting *Dirks*, 463 U.S. at 664). In the dissent's example of a disclosure of inside information to a reporter, for example, *see* Dissent Slip Op. at 5, a pre-existing personal relationship between the insider and the reporter might tend to show that the information was not disclosed for altruistic reasons but was instead disclosed "with the expectation that [the recipient] would trade on it." *Salman*, 137 S. Ct. at 428. A pre-existing personal relationship might also tend to show, however, that the insider trusted the reporter to scrupulously reveal a corporate fraud to the relevant authorities or the investing public. It is for the jury to decide, based on all of the facts and circumstances in a particular case, what to infer about the tipper's purpose from his relationship with the tippee.

"obvious" that an insider would personally benefit from "trad[ing] on [inside] information . . . himself and then giv[ing] the proceeds as a gift to his brother." *Salman*, 137 S. Ct. at 427–28. Our holding comports with *Salman*'s observation that personal benefit to the insider is equally obvious when an insider "effectively achieve[s] the same result by disclosing the information to [the tippee]" for the purpose of "allowing [the tippee] to trade on it." *Id*. at 428.

Contrary to the dissent's suggestion, not all disclosures of inside information will meet this test. For example, disclosures for whistleblowing purposes to reveal a fraud, *see Dirks*, 463 U.S. at 649–50, 667, and inadvertent disclosures, *see id.* at 663 & n.23, are not disclosures made "with the expectation that [the recipient] would trade on" them and thus involve no personal benefit to the insider. *Salman*, 137 S. Ct. at 428. There may also be other situations in which the facts do not justify the inference that information was disclosed "with the expectation that [the recipient] would trade on it," *Salman*, 137 S. Ct. at 428, and that the disclosure "resemble[s] trading by the insider followed by a gift of the profits to the recipient," *id*. at 427 (quoting *Dirks*, 463 U.S. at 664). As a result, our holding does not eliminate or vitiate the personal benefit rule; it merely acknowledges that it is *possible* to personally benefit from a disclosure of inside

29

information as a gift to someone with whom one does not share a "meaningfully close personal relationship." Phrased another way, we reject, in light of *Salman*, the categorical rule that an insider can *never* personally benefit from disclosing inside information as a gift without a "meaningfully close personal relationship."

## C.

It is, of course, the province of the jury to evaluate competing narratives and decide what actually motivated a tipper to disclose confidential information, and consequently, whether there was a personal benefit to the insider on the facts of a particular case. How can jurors, or this Court on appeal, know that inside information was disclosed "with the expectation that [the recipient] would trade on it," *Salman*, 137 S. Ct. at 428, and that the disclosure "resemble[d] trading by the insider followed by a gift of the profits to the recipient"? *Id*. at 427 (quoting *Dirks*, 463 U.S. at 664). Arguably, *Newman*'s "meaningfully close personal relationship" requirement could be construed as limited to the question of the sufficiency of *circumstantial* evidence in an insider trading case. *See* 773 F.3d at 451–53. But *Newman*'s sufficiency analysis appeared to assume that the personal benefit involved in giving a gift was "the ephemeral benefit of the . . . friendship" of the recipient of the gift. *Newman*, 773 F.3d at 452 (quoting *Jiau*, 734 F.3d at 153);

30

*see also id*. (explaining that the government cannot "prove the receipt of a

personal benefit by the mere fact of a friendship"). Because the Court in *Newman*

was of the opinion that friendship *itself*, "particularly of a casual or social

nature," did not constitute a personal benefit, it required more. 773 F.3d at 452.[9]

But as the Supreme Court explained in *Dirks* and reaffirmed again in *Salman*, the

personal benefit one receives from giving a gift of inside information is *not* the

friendship or loyalty or gratitude of the recipient of the gift; it is the imputed

pecuniary benefit of having effectively profited from the trade oneself and given

the proceeds as a cash gift. *See Salman*, 137 S. Ct. at 427–28; *Dirks*, 463 U.S. at 664.

If under *Dirks* and *Salman* it is not correct to characterize  the personal benefit at

issue in gift-giving as the receipt of friendship, then *Newman*'s discussion of the

---

[9] In particular, as described above, *Newman* held that a personal benefit could not
be inferred from gift-giving "in the absence of proof of a meaningfully close personal
relationship that generates an exchange that is objective, consequential, and represents
at least a potential gain of a pecuniary or similarly valuable nature." 773 F.3d at 452.
Under this standard, even a gift to one's best friend or spouse was insufficient to convey
the requisite personal benefit without some kind of objective exchange involving
potential pecuniary value. While the latter requirement was explicitly rejected by the
Supreme Court, *see Salman*, 137 S. Ct. at 428, viewing the "meaningfully close personal
relationship" requirement in its original context further demonstrates that *Newman*
understood the personal benefit involved in gift-giving to be the receipt of friendship
and concluded that this "ephemeral" benefit was simply not the kind of benefit that
should give rise to insider trading liability. *See* 773 F.3d at 452.

circumstances in which a jury can infer that a tipper personally benefitted from disclosing inside information as a gift must now be considered inapposite.

The dissent argues that "[w]hat counts as a 'gift' is vague and subjective."[10] Dissent Slip Op. at 2. We reiterate the Supreme Court's observation that "[d]etermining whether an insider personally benefits from a particular disclosure, a question of fact, will not always be easy for courts." *Salman*, 137 S. Ct. at 429 (quoting *Dirks*, 463 U.S. at 664) (alteration in original). As the dissent points out, many cases may rely on circumstantial evidence of intent. *See* Dissent Slip Op. at 20–21. Because we have concluded that the evidence presented at Martoma's trial was sufficient to convict under a straightforward pecuniary benefit theory, we need not consider the outer boundaries of when a jury is entitled to infer, relying on circumstantial evidence, that a particular disclosure was made "with the expectation that [the recipient] would trade on it," *Salman*, 137 S. Ct. at 428, and "resemble[d] trading by the insider followed by a gift of the

---

[10] The same might be said of the "meaningfully close personal relationship" test. When asked how "meaningfully close personal relationship" should be defined, Martoma and the government both invoked the basics of *Dirks* and *Salman*, agreeing that a "meaningfully close personal relationship" is the kind of relationship in which gifts are exchanged.

profits to the recipient," *id*. at 427 (quoting *Dirks*, 463 U.S. at 664). It is worth noting, however, that not all insider trading cases rely on circumstantial evidence. In some cases, the tipper may cooperate with the government and testify against the tippee, providing information on the motivation for disclosing inside information.  In other cases, other witnesses might testify about conversations with a tipper that shed light on the tipper's intentions. Thus, while concerns about the sufficiency of circumstantial evidence on the gift theory are not wholly without basis, the response to those concerns lies in appellate review of the sufficiency of the evidence of personal benefit, not in a definition of personal benefit that categorically excludes situations where the requisite personal benefit could be proven. In other words, the fact that some cases of insider trading might be hard to prove beyond a reasonable doubt based on circumstantial evidence (and might consequently be reversed on appeal as supported by insufficient evidence) does not mean that other cases—the doorman hypothetical discussed above, for example—should be outside the bounds of insider trading liability even where the government has put forward adequate proof of personal benefit.

As a final note on this point, the dissent is correct that the legality and ethics of insider trading are not necessarily coextensive. *See* Dissent Slip Op. at 43. But the legality of insider trading *is* coextensive with a corporate insider's fiduciary duty of loyalty to the corporation. *See Dirks*, 463 U.S. at 654, 659–60. The dissent would hold, in effect, that a corporate insider does not violate his or her duty of loyalty by disclosing inside information to an outsider as a gift with no legitimate corporate purpose so long as the gift is to someone with whom the insider does not share a "meaningfully close personal relationship." In our view, for the reasons discussed above, *Salman* and *Dirks* compel a different result.

**D.**

Having concluded that the evidence was sufficient to support Martoma's conviction and that *Newman*'s "meaningfully close personal relationship" requirement is no longer good law, the remaining question is whether the district court's jury instruction, which Martoma challenges for its failure to include *Newman*'s "meaningfully close personal relationship" requirement, accurately conveyed the elements of insider trading. The jury instruction given at Martoma's trial stated that a "gift [given] with the goal of maintaining or developing a personal friendship or a useful networking contact" constitutes a

34

personal benefit. Tr. 3191. Martoma focuses on the language about *developing*

friendships, arguing that gifts given to develop *future* friendships do not give rise

to the personal benefit needed to trigger insider trading liability. *Salman*

reiterated that when confidential information is given as a gift, it is "the same

thing as trading by the tipper followed by a gift of the proceeds" and is thus the

functional equivalent of a cash gift. *Salman*, 137 S. Ct. at 428. Whether the

recipient of the gift is an existing friend or a potential future friend whom a gift is

intended to entice, the logic—that a tipper personally benefits by giving inside

information in lieu of a cash gift—operates in a similar manner. For this reason,

the aspect of the district court's instruction on gifts with the goal of *developing*

friendships, which is at most "subject to reasonable dispute," did not constitute

"obvious" error. *Marcus*, 560 U.S. at 262 (internal quotation marks omitted).

Even if the jury instruction was obviously erroneous—which we hold it

was not—that error did not impair Martoma's substantial rights in light of the

compelling evidence that Dr. Gilman, the tipper, received substantial financial

benefit in exchange for providing confidential information to Martoma. As

discussed above, Dr. Gilman, over the course of approximately 18 months and 43

paid consultation sessions for which he billed $1,000 an hour, regularly and

35

*intentionally* provided Martoma with confidential information from the bapineuzumab clinical trial. Martoma kept coming back, specifically scheduling consultation sessions so that they would occur shortly after the safety monitoring committee meetings, when Dr. Gilman would have new information to pass along—and starting at least in August 2007, Dr. Gilman would reschedule his conversations with Martoma if he had no new information to reveal at the time they were scheduled to meet. Thus, the consulting relationship between Dr. Gilman and Martoma at that point involved no "legitimate service," *see* Dissent Slip Op. at 43; as Dr. Gilman testified at trial, "the purpose of those consultations was for [him] to disclose to [Martoma] confidential information about the results . . . of the last Safety Monitoring Committee [meeting]." Tr. 1274:6–9. And because Martoma continued to see Dr. Gilman to receive confidential information, Dr. Gilman continued to receive consulting fees. The fact that Dr. Gilman did not specifically bill for his July 17 and 19, 2008 conversations with Martoma in which Dr. Gilman divulged the final drug efficacy data does not alter the inescapable conclusion that in the context of this "relationship of *quid pro quo*," *Newman*, 773 F.3d at 452, Dr. Gilman's disclosure of confidential information was designed to "translate into future earnings." *United States v. Jiau*,

36

734 F.3d 147, 153 (2d Cir. 2013) (quoting *Dirks*, 463 U.S. at 663). As a result, "it is clear beyond a reasonable doubt that a rational jury would have found [Martoma] guilty absent [any] error." *United States v. Mahaffy*, 693 F.3d 113, 136 (2d Cir. 2012).

## CONCLUSION

We have considered Martoma's remaining arguments and find in them no basis for reversal. Accordingly, we **AFFIRM** the judgment of the district court.

POOLER, *Circuit Judge*:

Because the majority rejects limitations the Supreme Court set forth in

*Dirks v. S.E.C.*, 463 U.S. 646 (1983), and *Salman v. United States*, 137 S. Ct. 420

(2016), and overrules our holding in *United States v. Newman*, 773 F.3d 438 (2d

Cir. 2014), without convening this Court en banc, I cannot join the opinion. And,

because those precedents show that Martoma's jury instructions were erroneous

in a way that affected his rights at trial, I respectfully dissent.

\* \* \*

This appeal asks what the government must show to convict someone

criminally of trading on inside information, or to prevail on similar civil charges.

For years, the Supreme Court's decisions have required the government to show

that the relevant information came from an insider who divulged it in return for

a personal benefit.[1] The Supreme Court has described the "personal benefit" rule

---

[1] The majority notes, and I agree, that it is irrelevant for our purposes whether the source of the information is a true corporate "insider" or instead a corporate outsider who has improperly shared information with which he was trusted under the "misappropriation" theory of insider-trading liability, *see United States v. O'Hagan*, 521 U.S. 642, 651-53 (1997). *See United States v. Newman*, 773 F.3d 438, 446 (2d Cir. 2014) ("The elements of tipping liability are the same, regardless of whether the tipper's duty arises under the 'classical' or the 'misappropriation' theory."); *S.E.C. v. Obus*, 693 F.3d 276, 285–86 (2d Cir. 2012). I use the term "insider" interchangeably to refer either to an actual insider or someone who misappropriates information.

as a limiting principle of liability. The rule allows many people—including reporters and stock analysts—not to worry that they will become felons or face civil liability for telling information to others who later happen to trade on it. Without evidence that an insider let details slip in return for a personal benefit for himself or herself, the government cannot convict.

Today, the majority holds that an insider receives a personal benefit when the insider gives inside information as a "gift" to *any* person. In holding that someone who gives a gift *always* receives a personal benefit from doing so, the majority strips the long-standing personal benefit rule of its limiting power. What counts as a "gift" is vague and subjective. Juries, and, more dangerously, prosecutors, can now seize on this vagueness and subjectivity. The result will be liability in many cases where it could not previously lie.

In the past, we have held that an insider receives a personal benefit from bestowing a "gift" of information in only one narrow situation. That is when the insider gives information to family or friends—persons highly unlikely to use it for commercially legitimate reasons. Today's opinion goes far beyond that limitation, which was set by the Supreme Court in *Dirks*, 463 U.S. 646, received elaboration in this Court's opinion in *Newman*, 773 F.3d 438, and was left

undisturbed by the Supreme Court in *Salman*, 137 S. Ct. 420. In rejecting those precedents, the majority opinion significantly diminishes the limiting power of the personal benefit rule, and radically alters insider-trading law for the worse.

### 1. The Personal Benefit Rule

To prevail in an insider-trading case based on a tip from an insider to a trader, the government must prove several elements. *See, e.g.*, *United States v. Jiau*, 734 F.3d 147, 153 (2d Cir. 2013). Among them, the government must show that the insider had a fiduciary duty to protect the confidential information and nonetheless disclosed it in return for a personal benefit. *Dirks*, 463 U.S. at 659-64.

The requirement of a personal benefit exists because not "[a]ll disclosures of confidential corporate information are . . . inconsistent with the duty insiders owe to shareholders." *Id.* at 661. The law targets only someone who "takes advantage" of inside information to make "secret profits." *Id.* at 654. For example, the insider who reveals information inadvertently—perhaps letting it slip accidentally during a legitimate business conversation—has not committed insider trading. *See S.E.C. v. Obus*, 693 F.3d 276, 287 (2d Cir. 2012) (noting liability likely would not lie for an inadvertent disclosure); *see also Dirks*, 463 U.S. at 662. Similarly, insiders speaking for public-spirited reasons, such as "a desire to

3

expose . . . fraud," do not commit insider trading. *Dirks*, 463 U.S. at 667. To ensure that these cases, and similar ones, do not result in criminal or civil liability, the law requires the government to show that an insider benefitted personally in return for a tip.[2]

### a. Reasons for the Personal Benefit Rule

In introducing the personal benefit rule in *Dirks*, the Supreme Court explained that it was "essential . . . to have a guiding principle for those whose daily activities must be limited and instructed by the SEC's inside-trading rules," and that, without the personal benefit rule, there would be no such "limiting principle" for insider-trading liability. *Id.* at 664. The Supreme Court elaborated that, "[w]ithout legal limitations, market participants are forced to rely on the reasonableness of the SEC's litigation strategy, but that can be hazardous." *Id.* at 664 n.24. Before the personal benefit rule, the SEC believed that it had the power

---

[2] Why must the *insider* who tips receive a personal benefit before the *tippee* may be held liable? Tipping cases differ from situations where someone breaches a duty owed directly to the company by trading. In tipping cases, the tippee generally "has no . . . relationship[]" with the company or its shareholders, and so "the tippee's duty to . . . abstain [from trading] is derivative from . . . the insider's duty." *Dirks*, 463 U.S. at 655, 659. Without the insider's breach of duty, the tippee who receives the information, and tells it to others or trades on it, also breaches no duty and thus commits no crime. But if the insider does breach his or her duty in return for a benefit, and the crime's other requirements are satisfied, then both insider and tippee are liable.

to enforce insider-trading rules against "persons outside the company such as an analyst or reporter who learns of inside information." *Id.* (emphasis omitted). The Supreme Court, troubled by that possibility, created a rule foreclosing such prosecutions except when an insider has personally benefitted from a disclosure.

The Supreme Court also noted that the question of whether an insider personally benefitted from disclosure would "require[] courts to focus on objective criteria." *Id.* at 663. Rather than courts attempting to "read the parties' minds," *id.*, they would look to "objective facts and circumstances that [would] justify . . . an inference" that an insider received a personal benefit, *id.* at 664.

Without the personal benefit rule, many insider-trading cases would require the government to show few objective facts. Consider, for example, a situation where an insider conveys material, nonpublic information to a reporter, and the reporter tells it to a third person who trades on it.[3] Such a situation is entirely plausible for a financial news reporter who speaks to many sources. Suppose that the government, however, brings a civil suit against the reporter. To prevail, the government first must show that the insider is at fault by demonstrating that (1) the insider had a duty to keep the information secret, but

---

[3] *See Chiarella v. United States*, 445 U.S. 222, 227 (1980) (stating that insider-trading charge requires that the information disclosed is material and nonpublic).

5

did not, that (2) the insider knew, or should have known, that the reporter would benefit from the information, and that (3) the insider personally benefitted from disclosing the information.[4] After the government shows that the insider was at fault, the government must show that (4) the reporter knew, or should have known, of the insider's breach of duty and personal benefit.[5] Last, the government must show that (5) the reporter either knew, or should have known,

---

[4] *See Obus*, 693 F.3d at 288-89 ("A tipper will be liable if he tips . . . to someone he [knows or has reason to know] will likely (1) trade on the information or (2) disseminate the information further for the first tippee's own benefit.").

[5] *See Dirks*, 463 U.S. at 659-64 (discussing necessity of insider's duty and personal benefit); *Obus*, 693 F.3d at 289 ("Tippee liability requires that (1) the tipper breached a duty by tipping confidential information; (2) the tippee knew or had reason to know that the tippee improperly obtained the information (i.e., that the information was obtained through the tipper's breach); and (3) the tippee, while in knowing possession of the material non-public information, used the information by trading or by tipping for his own benefit."); *United States v. Mylett*, 97 F.3d 663, 668 (2d Cir. 1996) ("Rule 10b-5 requires that the defendant subjectively believe that the information received was obtained in breach of a fiduciary duty."); *Newman*, 773 F.3d at 448 (rejecting argument that a tippee's "knowledge of [the tipper's] breach of the duty of confidentiality without knowledge of the [tipper's] personal benefit [from doing so] is sufficient to impose criminal liability."). *Salman* suggested it is required, at least in a criminal case, that "the tippee *knew* that the tipper disclosed the information for a personal benefit *and that the tipper expected trading to ensue.*" 137 S. Ct. at 427 (emphasis added). It is not entirely clear whether this statement modified the elements of the offense, given that the tipper's level of knowledge of trading was not at issue in *Salman*.

of the third person's intention to trade, and that (6) the reporter received a personal benefit from passing the information to the third person.[6]

These requirements at first appear weighty. Except for the "personal benefits," however, the requirements relate only to each individual's state of mind. In a civil suit, to prove these state-of-mind requirements, the government need not show that the insider *knew* the reporter would benefit, or that the reporter *knew* of the insider's duty and breach or the third person's intention to trade. It is enough to show that the insider and the reporter *should have known.*[7] Typically, circumstantial evidence meets this minimal requirement. The government could argue that the insider and the reporter each heard and shared

---

[6] *See Obus*, 693 F.3d at 288-89 ("A tipper will be liable if he tips . . . to someone he [knows or has reason to know] will likely (1) trade on the information or (2) disseminate the information further for the first tippee's own benefit."). Note that this same requirement must be met for the government to show that the initial tipper improperly gave information to the reporter. *Id.* at 289.

[7] *Obus*, 693 F.3d at 286 ("In every insider trading case, at the moment of tipping or trading . . . the unlawful actor must know or be reckless in not knowing that the conduct was deceptive."); *see Dirks*, 463 U.S. at 660 (stating that liability may result when "the tippee knows or should know that there has been a breach" of the insider's duty).

a certain type of information with certain people, and thus should have known of the relevant duties, breaches, and benefits.[8]

In a criminal case, at least in this Circuit, it is not enough for the government to show mere recklessness to fulfill the state-of-mind requirements.[9] The reporter's conduct must be willful—he must "subjectively believe" duties were breached. *United States v. Mylett*, 97 F.3d 663, 668 (2d Cir. 1996).[10] As in civil

---

[8] *See Newman*, 773 F.3d at 454 ("The [g]overnment argues that given the detailed nature and accuracy of [the information they received], [the defendants] must have known, or deliberately avoided knowing, that the information originated with corporate insiders, *and* that those insiders disclosed the information in exchange for a personal benefit."); *Mylett*, 97 F.3d at 668 ("[The tippee] knew that he had obtained information from [the insider]. He argues that . . . nothing about [the insider]'s position . . . would logically give rise to the inference that he was disclosing inside information. Because [the tippee] knew that [the insider] was a Vice President of AT & T, this contention is meritless." (internal quotation marks omitted)).

[9] The Supreme Court in *Salman* suggested that all criminal cases now require a showing of knowledge regarding the tipper's duty and breach. *See Salman*, 137 S. Ct. at 423 ("The tippee acquires the tipper's duty if the tippee *knows* the information was disclosed in breach of the tipper's duty, and the tippee may commit securities fraud by trading in disregard of *that knowledge*." (emphasis added)). It is not clear, however, whether this statement alters the standard for civil cases.

[10] *See United States v. Gansman*, 657 F.3d 85, 91 n.7 (2d Cir. 2011) ("To impose criminal sanctions, the government must prove . . . that the defendant's conduct was willful. Civil liability, on the other hand, may attach if the government proves . . . that the defendant's conduct was merely reckless, rather than willful." (internal citations omitted)).

cases, however, "[s]uch belief may . . . be shown by circumstantial evidence," and the government often argues as much. *Id.*

The personal benefit requirement limits liability in situations like the one described in the hypothetical above. It requires the government to show that the insider received a benefit for disclosing the information, that the reporter received a benefit for sharing it, and that the reporter had reason to know of both. Assuming that the personal benefit must be demonstrated by objective facts, it limits the government's ability to hold persons liable where they "mistakenly think . . . information already has been disclosed or that it is not material enough to affect the market." *Dirks*, 463 U.S. at 662; s*ee also Obus*, 693 F.3d at 287 (noting liability likely would not lie for an inadvertent disclosure). The personal benefit rule makes it unlikely that persons with innocent intentions will violate the law by sharing information with others: someone is unlikely to receive a benefit from sharing information unless he or she knows the information is material and nonpublic. It also provides greater notice to persons hearing information that the information was shared improperly: the awareness that someone benefitted from sharing the information suggests that revealing it was not honorable.

### b. Evolution of the Personal Benefit Rule

The development of the personal benefit rule from *Dirks*, to this Court's

opinion in *Newman*, and then to the Supreme Court's opinion in *Salman*, is crucial

to understanding why the majority's rule in the opinion today goes far beyond

the law's previous understanding of what constitutes a personal benefit.

### i. *Dirks*

In *Dirks*, the Supreme Court first provided a list of items satisfying the

requirement that an insider receive a personal benefit from revealing inside

information:

> [C]ourts [must] focus on objective criteria, *i.e.*, whether the insider
> receives a direct or indirect personal benefit from the disclosure,
> such as a pecuniary gain or a reputational benefit that will translate
> into future earnings. There are objective facts and circumstances that
> often justify such an inference. For example, there may be a
> relationship between the insider and the recipient that suggests a
> *quid pro quo* from the latter, or an intention to benefit the particular
> recipient. The elements of fiduciary duty and exploitation of
> nonpublic information also exist when an insider makes a gift of
> confidential information to a trading relative or friend. The tip and
> trade resemble trading by the insider himself followed by a gift of
> the profits to the recipient.

*Dirks*, 463 U.S. at 663–64 (internal citations omitted). Two of the possible personal

benefits, "a pecuniary gain" and "a reputational benefit that will translate into

future earnings," correspond closely with the ordinary understanding of a

10

"benefit." The third, "a gift of confidential information," perhaps corresponds less closely. It is not entirely straightforward why *giving* a gift provides the gift-giver with a benefit. But the Court restricted the applicability of that theory to cases where the gift is given to the tipper's "trading relative or friend." Such a limitation makes the theory defensible, because, as Justice Breyer noted at oral argument in *Salman*, "to help a close family member [or friend] is like helping yourself." Transcript of Oral Argument at 8, *Salman v. United States*, 137 S. Ct. 420 (2016) (No. 15-628).

### ii. *Newman*

Our opinion in *Newman* built on the gift-giving theory in *Dirks* in two ways.[11] *Newman* first held that, when the government wishes to show a personal benefit based on a gift within a friendship, as permitted by *Dirks*, the friendship must be "a meaningfully close personal relationship":

> To the extent *Dirks* suggests that a personal benefit may be inferred from a personal relationship between the tipper and tippee, where the tippee's trades "resemble trading by the insider himself followed by a gift of the profits to the recipient," we hold that *such an inference*

---

[11] *Newman* also rejected the argument that a tippee's "knowledge of [the tipper's] breach of the duty of confidentiality without knowledge of the [tipper's] personal benefit [from doing so] is sufficient to impose criminal liability." 773 F.3d at 448. The majority does not suggest that this proposition of law is in doubt. In any case, it is not at issue in this appeal.

*is impermissible in the absence of proof of a meaningfully close personal relationship* that generates an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature.

*Newman*, 773 F.3d at 452 (emphasis added) (internal citations, quotation marks, and brackets omitted). The opinion in *Newman* expressed concern that, without such a limitation, the government would present superficial "friendships" not worthy of the name:

> We have observed that personal benefit is broadly defined to include . . . the benefit one would obtain from simply making a gift of confidential information to a trading relative or friend. This standard, although permissive, does not suggest that the Government may prove the receipt of a personal benefit by the mere fact of a friendship, particularly of a casual or social nature. If that were true, and the Government was allowed to meet its burden by proving that two individuals were alumni of the same school or attended the same church, the personal benefit requirement would be a nullity.

*Id. Newman* thus expressed concern that inferring a benefit from a gift within a "casual or social" relationship failed to honor the requirement that "the personal benefit received in exchange for confidential information . . . be of some consequence." *Id.* Like *Dirks*, *Newman*'s first holding was clearly animated by the idea that the personal benefit requirement could not become "a nullity" given its role as a limiting principle of liability. *Id.* It attempted to specify what *Dirks* had

12

left unclear—how close persons must be for a gift between them to count as a benefit to the gift-giver.

Second, *Newman* held that an insider's gift to a friend only amounted to a personal benefit if the gift might yield money (or something similar) for the insider. 773 F.3d at 452. Although *Dirks* said that "[t]he elements of fiduciary duty and exploitation of nonpublic information . . . exist when an insider makes a gift of confidential information to a trading relative or friend," 463 U.S. at 663–64, *Newman* interpreted *Dirks* to require not merely a gift to a friend, but also that it be given in the context of a relationship that "generates an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature." *Newman*, 773 F.3d at 452.

### iii. *Salman*

After *Newman*, the Supreme Court decided *Salman v. United States*. *Salman* involved three persons—Maher and Michael, who were brothers, and Salman, the defendant, who was Maher's brother-in-law and Michael's "friend" and "extended family member." 137 S. Ct. at 423-24. Maher, who had inside information, would disclose it to his brother Michael, who then passed it to Salman. *Id.* Salman traded on it. *Id.* at 424.

The defendant, Salman, "argue[d] that he [could not] be held liable as a tippee because" Maher "did not personally . . . benefit from" giving tips. *Id.* at 424. The case, in other words, turned on whether "Maher, the tipper," received a personal benefit when he "provided inside information to a close relative, his brother Michael." *Id.* at 427. Salman contended that Maher "did not personally receive money or property in exchange for the tips and thus did not personally benefit from them." *Id.* at 424. In short, Salman argued that even though Maher had disclosed information to his (Maher's) brother, Maher did not receive a personal benefit from that disclosure unless he also stood to benefit financially from it. *Id.*

The Supreme Court affirmed the Court of Appeals for the Ninth Circuit, which had rejected Salman's argument. *Id.* The Supreme Court explained that "the Court of Appeals properly applied *Dirks*" in ruling that "*Dirks* allowed the jury to infer that the tipper here breached a duty because he made a gift of confidential information to a trading relative." *Id.* (internal quotation marks omitted). The Supreme Court held that a tipper did not need to receive money or property to benefit personally when disclosing to a friend or relative. *Id.* at 428.

14

The Supreme Court's opinion in *Salman* overturned *Newman*'s second holding, which required a showing that a tipper would receive something of "pecuniary or similarly valuable nature" even when making a gift to relatives or friends. Regarding *Newman*'s second holding, the Supreme Court wrote the following:

> To the extent the Second Circuit held that the tipper must also receive something of a "pecuniary or similarly valuable nature" in exchange for a gift to family or friends, *Newman*, 773 F.3d at 452, . . . this requirement is inconsistent with *Dirks*.

*Salman*, 137 S. Ct. at 428 (internal citation omitted). The Supreme Court stated that, "when a tipper gives inside information to a trading relative or friend, the jury can infer that the tipper meant to provide the equivalent of a cash gift." *Id.* (internal quotation marks omitted). Thus, after *Salman*, a gift of information to a "trading relative or friend" is sufficient, without an accompanying monetary or other gain, for a fact-finder to conclude that a tipper received a personal benefit.

The Supreme Court, however, left *Newman*'s first holding untouched. The Supreme Court quoted the first holding of *Newman*, that the inference of a personal benefit from a gift "is impermissible in the absence of proof of a meaningfully close personal relationship." *Salman*, 137 S. Ct. at 425 (quoting *Newman*, 773 F.3d at 452). But the Supreme Court explicitly stated that it

15

overruled *Newman* only "*[t]o the extent*" that it required an insider to "receive something of a 'pecuniary or similarly valuable nature'" as a result of giving a gift to a friend. *Salman*, 137 S. Ct. at 428 (emphasis added). The Supreme Court's statement showed no disapproval of the "meaningfully close personal relationship" language in *Newman*.

Had the Supreme Court discussed the "meaningfully close personal relationship" requirement of *Newman*—which it did not—that discussion would have been dicta. *Salman* considered whether a gift shared between *brothers* could show a personal benefit. *See* 137 S. Ct. at 424. An opinion considering a relationship between brothers does not need to rule on, or even address, how close two persons' friendship must be for them really to be "friends."

To the extent *Salman* discussed the relationship between Maher and Michael, it took pains to emphasize, repeatedly, that they were extremely close:

> Maher enjoyed a close relationship with his older brother, Mounir Kara (known as Michael). . . . At first he relied on Michael's chemistry background to help him grasp scientific concepts relevant to his new job. Then, while their father was battling cancer, the brothers discussed companies that dealt with innovative cancer treatment and pain management techniques.
>
> . . . .
>
> The evidence at trial established that Maher and Michael enjoyed a "very close relationship." Maher "loved his brother very much,"

16

> Michael was like "a second father to Maher," and Michael was the best man at Maher's wedding to Salman's sister. Maher testified that he shared inside information with his brother to benefit him and with the expectation that his brother would trade on it. While Maher explained that he disclosed the information in large part to appease Michael (who pestered him incessantly for it), he also testified that he tipped his brother to "help him" and to "fulfill whatever needs he had."
>
> . . . .
>
> Maher, the tipper, provided inside information to a close relative, his brother Michael.

*Id.* at 424, 427 (citations omitted). The fact that Michael and Maher were not only brothers, but otherwise were "very close," "enjoyed a close relationship," "loved" each other "very much," that Michael served as "best man at Maher's wedding," and that the two were "close relatives" demonstrates that any discussion in *Salman* of the requirements for the closeness of a friendship was unnecessary to resolve the appeal. The Supreme Court did not need to decide how close a relationship must be for two persons to be "friends" or "meaningfully close," because the relationship between Michael and Maher would have satisfied any conceivable test.

Beyond leaving *Newman*'s first holding untouched, the Supreme Court's decision in *Salman* also declined to adopt the government's theory of the personal benefit rule, which would have broadened the gift-giving doctrine

17

substantially. In *Salman*, the government argued that "a gift of confidential information to anyone, not just a 'trading relative or friend,' is enough to prove securities fraud." *Id.* at 426. Such a holding would have substantially broadened the rule in *Dirks*, which stated that a personal benefit may be inferred when "an insider makes a gift of confidential information to a trading relative or friend." 463 U.S. at 664. The Supreme Court did not adopt the government's view, deciding instead to "adhere to *Dirks*." *Salman*, 137 S. Ct. at 427.

To summarize, *Dirks* held that a gift of information to an insider's relatives or friends could permit an inference of a personal benefit. In *Newman*, we held that such an inference could only be made when (1) the gift was exchanged within a "meaningfully close personal relationship," and (2) a gift created the potential for an insider to receive a pecuniary or similar benefit. *Salman* reversed the second holding of *Newman*, requiring the potential of pecuniary gain, but left untouched the first holding that, in order to allow inference of a personal benefit, gifts must be exchanged within a "meaningfully close personal relationship."

### c. The Majority's Change to the Personal Benefit Rule

The majority today articulates a rule that permits inference of a personal benefit whenever an insider makes a "gift" of information to *anyone*, not just to

18

relatives or meaningfully close friends. As the majority puts it, "a corporate insider personally benefits whenever he discloses inside information as a gift with the expectation that the recipient would trade on the basis of such information or otherwise exploit it for his pecuniary gain." Slip Op. at 25 (internal quotation marks, brackets, and ellipsis omitted). Or, put another way, "[i]f the insider discloses inside information . . . and the disclosure resembles trading by the insider followed by a gift of the profits to the recipient, he personally benefits." *Id.* at 26 (internal quotation marks, citations, and brackets omitted).

The majority declines to provide further guidance on what counts as a "gift." Slip Op. at 33 ("[W]e need not consider the outer boundaries of when a jury is entitled to infer . . . that a particular disclosure . . . resembled trading by the insider followed by a gift of the profits to the recipient." (internal quotation marks and brackets omitted)). Any disclosure of material, non-public information clearly resembles a gift, in that it provides the recipient with something of value. The rule limiting the gift theory to relatives and friends made it largely unnecessary to ask what distinguished a "gift" from a non-gift disclosure, in that most insiders have few reasons beyond gift-giving to share

19

valuable business secrets with close friends or family members. But in other cases, simply telling a jury to distinguish between a disclosure that is a gift, as opposed to one that is not, with no further guidance, invites decision-making that is entirely arbitrary and subjective. It puts the analysis largely on the intentions of the parties, which is likely to be unclear and proven through circumstantial evidence. In short, it undermines the objectivity and limitation that the personal benefit rule is designed to provide. *See Dirks*, 463 U.S. at 662-64.

The majority emphasizes that the vastly-expanded "gift" rule "reaches only the insider [or other tipper] who discloses information to someone *he expects will trade on the information*." Slip Op. at 29 (emphasis in original). This rule is a separate requirement for insider-trading liability in tipping cases, *see Obus*, 693 F.3d at 286-87; *United States v. Gansman*, 657 F.3d 85, 92 (2d Cir. 2011),[12] so the majority's reiteration of it does not add a new limitation to replace the personal benefit rule. It is, moreover, no significant limitation at all. The majority

---

[12] *Gansman* notes that "the SEC has recognized a number of situations . . . in which a tippee, but not the tipper, may be liable for insider trading on the theory that the tippee owed a duty of trust or confidence to the tipper and the tipper conveyed confidential information without intending to have it used for securities trading purposes." 657 F.3d at 92. But these are not true "tipping" cases, inasmuch as someone who *legally* entrusts information to another person is not providing a "tip" in any meaningful sense.

20

acknowledges that "many cases may rely on circumstantial evidence of intent." Slip Op. at 32. That means, even in a criminal case, that the government needs to show no objective facts to demonstrate a tipper's expectation that a tippee would benefit from the information. And, as noted above, civil cases do not even require that the tipper *actually* thought the tippee would trade, but instead just that the tipper *should have known* that the information would prompt a trade or a further tip.[13] In short, the independent requirement that the government show circumstantial evidence that a defendant knew, or should have known, that a recipient would trade on information, or otherwise benefit from it, does not rescue the majority's weakening of the personal benefit rule.

The majority also notes that defendants convicted under the greatly-expanded "gift" rule will have the right to "appellate review of the sufficiency of the evidence of personal benefit." Slip Op. at 33. In other words, persons dealing with inside information should not worry that they may be ensnared by

---

[13] *See Obus*, 693 F.3d at 287 (observing that "a tipper cannot avoid liability merely by demonstrating that he did not know to a certainty that the person to whom he gave the information would trade on it," and noting that "recklessness" is "actionable" in civil settings); 291 (concluding, in civil proceeding where a tip was a gift to a friend, that the "evidence easily supports a finding of knowing or reckless tipping to someone who likely would use the information to trade in securities").

21

ambiguous circumstances, because after they are convicted, they will enjoy a review proceeding where they "carry a heavy burden" to show that, "drawing all inferences in favor of the prosecution and viewing the evidence in the light most favorable to the prosecution," *no* rational trier of fact could have found that a disclosure was a gift. *See United States v. Santos*, 449 F.3d 93, 102 (2d Cir. 2006) (internal quotation marks omitted). It is unclear why the majority believes that the cure for convictions that may rely entirely on circumstantial evidence is a proceeding where that same circumstantial evidence is evaluated in the light least favorable to the defendant.[14]

The majority's rule is inconsistent with *Newman*'s "meaningfully close personal relationship" requirement, which the majority explicitly overrules. The majority claims that *Salman* "cast[] doubt" on the rule. Slip Op. at 23. The majority takes this view even though *Salman* explicitly abrogated *Newman* only in a single, narrower respect; even though *Salman* had no occasion to discuss friendships since the case was about brothers; and even though *Salman*

---

[14] The majority also notes that "not all insider trading cases rely on circumstantial evidence." Slip Op. at 33. That observation will be cold comfort for defendants convicted based on circumstantial evidence alone. Rules of criminal liability should not rely on our hope that, in some cases, the government will present far more evidence than is required. We should instead be concerned with the minimum that the government must show to convict a criminal defendant.

emphatically declared the Supreme Court's intention to adhere to *Dirks*, which was the basis of *Newman*. The source of the majority's doubt is mysterious.

The majority also makes a bolder claim: that the limitation described in *Dirks*—that a personal benefit may only be inferred from a gift when the gift is between friends or relatives—is no longer good law. Slip Op. at 26-27 (noting that "[i]f the insider discloses inside information . . . and the disclosure resembles trading by the insider followed by a gift of the profits to the recipient, he personally benefits," and suggesting that the rule is "not limited by the relationships of the parties," and that the rule may apply even without "a personal relationship of any kind, let alone a friendship" between tipper and tippee (internal quotation marks and brackets omitted)). The majority reaches this conclusion even though, as noted, *Salman* spoke only of gifts raising the inference of a personal benefit when "a tipper gives inside information to a *trading relative or friend*," 137 S. Ct. at 428 (emphasis added), and even though *Salman* specifically noted the government's view that all gifts (no matter to whom) count as benefits, but did not adopt that view.

### i. The Majority's Reading of *Salman* and *Dirks*

The majority seizes on several features of *Salman* to contend that the decision called into question the "meaningfully close personal relationship" requirement of *Newman* and the "friends and relatives" limitation of *Dirks*. First, the majority quotes *Salman* as saying that "'insiders [are] forbidden' both 'from personally using undisclosed corporate information to their advantage' and from 'giv[ing] such information to an outsider for the same improper purpose of exploiting the information for their personal gain,'" and suggests that this statement is not limited to gifts between relatives and friends. Slip Op. at 25, 27. This quotation, however, comes from a parenthetical in *Salman* summarizing *Dirks*, which, when read in context, does not suggest that liability can be sustained by gifts other than those to relatives and friends:

> *Maher effectively achieved the same result by disclosing the information to Michael, [his brother,] and allowing him to trade on it. Dirks* appropriately prohibits that approach, as well. *Cf.* 463 U.S., at 659 (holding that "insiders [are] forbidden" both "from personally using undisclosed corporate information to their advantage" and from "giv[ing] such information to an outsider for the same improper purpose of exploiting the information for their personal gain"). *Dirks specifies that when a tipper gives inside information to "a trading relative or friend,"* the jury can infer that the tipper meant to provide the equivalent of a cash gift.

137 S. Ct. at 428 (emphasis added) (brackets in original). The majority quotes the Supreme Court's parenthetical, leaving unstated its previous sentences applying the theory to a family member, and its next sentence summarizing *Dirks* as permitting an inference of benefit when the insider gives a gift to "a trading relative or friend." Given this language, the Supreme Court cannot have meant, by writing the above-quoted passage, to rule on whether gifts permit the inference of a benefit when they are given to persons other than trading relatives or friends.

Although the Supreme Court repeatedly stated in *Dirks* and *Salman* that a personal benefit may be inferred from an insider's "gift . . . to a trading relative or friend," the majority believes those statements were not meant "to *limit*" the "gift" theory to gifts between relatives or friends. Slip Op. at 21. But the majority does not explain why, if the Supreme Court meant that *any* gift could create the inference of a benefit, it would have repeatedly referred only to gifts among friends and relatives. Such an intention would be particularly puzzling given the sheer number of times in *Salman* the Supreme Court listed this qualification, including the following:

> A tipper breaches such a fiduciary duty, we held [in *Dirks*], when the tipper discloses the inside information for a personal benefit. And,

25

we went on to say, a jury can infer a personal benefit . . . where the tipper receives something of value in exchange for the tip or "makes a gift of confidential information to *a trading relative or friend*."

. . .

In particular, we held [in *Dirks*] that "the elements of fiduciary duty and exploitation of nonpublic information also exist *when an insider makes a gift of confidential information to a trading relative or friend*."

. . .

*Dirks* makes clear that a tipper breaches a fiduciary duty by making a gift of confidential information to "*a trading relative*," and that rule is sufficient to resolve the case at hand.

. . .

*Dirks* specifies that when a tipper gives inside information to "*a trading relative or friend*," the jury can infer that the tipper meant to provide the equivalent of a cash gift.

137 S. Ct. at 423, 427, 428 (emphasis added). In the majority's view, the Supreme Court's references to "a trading relative or friend," stated in *Dirks* and repeated nearly a half-dozen times in *Salman*, are just superfluous.

The majority additionally notes that the Supreme Court "applied" the gift theory in *Dirks*, where there was no "personal relationship of any kind" between Dirks and the insiders, and suggests that *Dirks* "implicitly" agreed with the position that the gift theory is "not limited by the relationships of the parties." Slip Op. at 26-27. It is true that, in *Dirks*, the Supreme Court stated that the insiders' "purpose [was not] to make a gift of valuable information to Dirks."

26

*Dirks*, 463 U.S. at 667. But the Supreme Court did not say that, *had* the insiders given a gift, it would have been sufficient to support liability. The intent to give a gift is a necessary but not sufficient condition for liability under the gift theory; having determined that it was absent, the Supreme Court did not need to discuss the parties' relationship.

### ii. The Majority's Argument Based on the Theory that Gifts Resemble an Insider's Trade Followed by a Gift of Profits

The majority also emphasizes the following passage in *Salman*:

> In particular, [in *Dirks*,] we held that "the elements of fiduciary duty and exploitation of nonpublic information . . . exist *when an insider makes a gift of confidential information to a trading relative or friend*." In such cases, "the tip and trade resemble trading by the insider followed by a gift of the profits to the recipient."

137 S. Ct. at 427 (citations and brackets omitted; emphasis in original). Omitting the Supreme Court's italicized statement that the rule applies to gifts between relatives and friends, the majority focuses only on the latter sentence: "In such cases, the tip and trade resemble trading by the insider followed by a gift of the profits to the recipient." *Salman*, 137 S. Ct. at 427; *see* Slip Op. at 24, *see also id.* at 26. The majority states that this sentence means that "the personal benefit one receives from giving a gift of inside information is *not* the friendship or loyalty or gratitude of the recipient of the gift; it is the imputed pecuniary benefit of having

effectively profited from the trade oneself and given the proceeds as a cash gift." Slip Op. at 31-32 (emphasis in original). Accordingly, the majority believes a benefit may be imputed to a gift-giver even when the recipient is not a friend or relative. The *only* question should be whether "the tip and trade resemble trading by the insider followed by a gift of the profits to the recipient." Slip Op. at 24 (brackets omitted); *see also id.* at 26.

There are several problems with this line of argument. First, the majority does not consider that there may be *two* limitations on whether a particular disclosure confers a "personal benefit," and that each limitation need not spring from the same reasoning. It is perfectly reasonable to say that gifts can, *in principle*, confer a personal benefit to the giver, but that *most* gifts actually confer little or no such benefit. And a main area in which it is reasonable to see gifts as creating a benefit for the gift-giver is when the gifts go to family or close friends.

Gifts to family or friends are more likely to confer a benefit upon the gift-giver because, as noted above, "to help a close family member [or friend] is like helping yourself." Transcript of Oral Argument at 8, *Salman v. United States*, 137 S. Ct. 420 (2016) (No. 15-628). This is true for several reasons. First, a person often benefits directly when making significant gifts to friends and relatives. A

family member who receives a new car or apartment (or even a book) might

share it with the gift-giver; similarly, providing a stock tip to a relative may

obviate the need to give the type of loan sometimes expected of close kin. A gift-

giver may also benefit because of his or her genuine enjoyment of the recipient's

happiness. And last, the gift-giver may benefit from improved relations with

friends or relatives. When gifts pass to relatives or friends, there is thus far

greater reason than usual to believe that the gift-giver has benefitted personally,

as the same benefits rarely accompany a gift to a casual acquaintance or a

stranger.[15]

Moreover, permitting a personal benefit to be inferred only from those

gifts between relatives and friends avoids much of the potential for liability

based on innocent conduct that might flow from a broader "gift" rule. As noted

above, insiders typically have no legitimate commercial reason to share business

secrets with friends and family. An inference that information passed by the

---

[15] The majority counters that these benefits do not relate to the Supreme Court's statement that "the tip and trade resemble trading by the insider followed by a gift of the profits to the recipient," *Salman*, 137 S. Ct. at 427. *See* Slip Op. 26 n.7. But the majority's criticism ignores the Supreme Court's "friends and relatives" limitation on the "gift" theory, which must also be given significance. The particular benefits explained above show why gifts to relatives and friends are distinctive, and why such gifts occupy a limited area within the universe of gifts where a benefit to the gift-giver may typically be presumed.

insider to a friend or relative was intended as a gift, rather than for business

reasons, is thus far more defensible than a similar inference based on a gift

between strangers or colleagues.

In demanding that the "gift" rule be justified by a single line of reasoning,

the majority ignores the fact that logically independent limitations often cabin

legal rules that would otherwise be unworkable because they extend too far. For

example, in tort law, the doctrine that persons are liable for harms brought about

by their actions is limited by what consequences they might reasonably have

foreseen, and other rules of proximate causation. *Palsgraf v. Long Island R. R. Co.*,

248 N.Y. 339 (1928). In contract law, the principle that the parties' agreement at

the time of the contract sets their duties is limited by a freestanding rule of

impracticability. *See* Restatement (Second) of Contracts § 261 (Am. Law Inst.

1981). In the law of insider trading, the Supreme Court appears to have made a

similar rule. It stated the principle that gifts may confer a benefit to the gift-giver

because of their similarity to trading and gifting the profits, but limited that

rule's reach to situations where the recipient is a relative or friend. And the

limitation to friends and relatives prevents the gift rule from extending much too

far: if interpreted broadly, the term "gift" could cover nearly any disclosure, and thus eliminate the personal benefit rule entirely.

Finally, even if tension exists between the principles that (1) a gift of information may provide an insider a benefit, and (2) that such a benefit may be inferred only from gifts to family and friends, such tension has existed since *Dirks*, where both of these statements appear. *Dirks*, 463 U.S. at 664. Our opinion in *Newman* chose between the two (arguably) competing rationales, and emphatically stated that we would infer a benefit only where gifts are exchanged within meaningfully close personal relationships. 773 F.3d at 452. Nothing in *Salman* breaks new ground on the point. Thus, there is nothing new that suggests we should reverse *Newman*'s decision without a hearing en banc.

### iii. The Majority's Theory was Not Adopted in *Salman*

I note, also, that the majority's opinion exactly mirrors the government's view pressed in *Salman*: that "a gift of confidential information to anyone, not just a 'trading relative or friend,' is enough to prove securities fraud." *Salman*, 137 S. Ct. at 426. The Supreme Court, however, did not adopt that view. *Id.* at 427. It is curious indeed that the majority would understand *Salman* to require us to take a position that the Supreme Court explicitly considered but did not adopt.

31

Accordingly, I would hold (1) that *Salman* does not overrule *Newman*'s "meaningfully close personal relationship" requirement, and (2) that *Salman* does not overrule the limitation described in both *Dirks* and in *Salman* itself—that an inference of personal benefit may be based on an insider's gift to relatives or friends, but not a gift to someone else.

### 2. Martoma's Jury Charge Was Plainly Erroneous, and the Error was not Harmless

Having determined that *Newman* is still applicable, I next consider, under the standard articulated in *Newman*, whether Martoma's jury instruction was plainly erroneous, and, if so, whether the error was harmless. We review for plain error because Martoma did not object to the jury instruction on grounds related to the rule in *Newman*. *See* Fed. R. Crim. P. 52 ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."). His slip-up was, of course, eminently understandable, given that the rule in *Newman* did not yet exist at the time of Martoma's trial.

The plain-error standard requires "that (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected [Martoma's] substantial rights . . . and (4) the error seriously affects the fairness,

integrity[,] or public reputation of judicial proceedings." *United States v. Prado*, 815 F.3d 93, 100 (2d Cir. 2016).

### a. The "Modified Plain Error Rule" Applies

I would apply our "modified plain error" rule in these circumstances. *See United States v. Viola*, 35 F.3d 37, 41-43 (2d Cir. 1994). In the past, we have held that "[w]here . . . the source of an alleged jury instruction error is a supervening decision, we employ a 'modified plain-error rule, under which the government, not the defendant, bears the burden to demonstrate that the error was harmless.'" *United States v. Mahaffy*, 693 F.3d 113, 136 (2d Cir. 2012) (quoting *United States v. Bahel*, 662 F.3d 610, 634 (2d Cir. 2011)).

A number of panels of this Court have suggested, without deciding, that our "modified plain error rule" may not have "survived the Supreme Court's decision in *Johnson v. United States*, 520 U.S. 461 (1997)." *Bahel*, 662 F.3d at 634; *see also United States v. Boyland*, No. 15-3118, 2017 WL 2918840, at *7 (2d Cir. July 10, 2017) ("[W]e have acknowledged doubt as to the continued viability of the modified plain error test but have not had the need to address it."); *United States v. Botti*, 711 F.3d 299, 308-09 (2d Cir. 2013) (discussing whether *Johnson* overruled the modified plain error test).

We should adhere to the modified plain error rule when considering a supervening legal change for two reasons. First, we are bound by post-*Johnson* precedents of our Court that apply the rule. The panel in *Mahaffy* recited the modified plain error rule in 2012—over a decade after *Johnson*—and stated that the rule applied when "the source of an alleged jury instruction error is a supervening decision." 693 F.3d at 135-36.  The panel then relied on the rule in vacating a conviction. *Id.* The panel in *United States v. Monteleone* also relied on the rule, and that case, too, was decided after *Johnson*. 257 F.3d 210, 223 (2d Cir. 2001).

Second, neither *Johnson* nor its reasoning challenges our modified plain error rule. In *Johnson*, the Supreme Court considered an appeal of a perjury conviction. *Johnson*, 520 U.S. at 463. During Johnson's trial, the district court ruled that the element of materiality, which was required to sustain a conviction under the perjury statute, was a question for the judge and not the jury. *Id.* at 464. That decision was "in accordance with then-extant Circuit precedent." *Id.* But after Johnson's conviction, the Supreme Court ruled in *United States v. Gaudin*, 515 U.S. 506 (1995), that materiality in perjury prosecutions was a question for the jury, not the judge. *Johnson*, 520 U.S. at 464.

Johnson did not object at trial to the district judge's ruling that materiality was a question for the judge. She argued on appeal, however, that she should be excused from showing that the district court's decision was plainly erroneous instead of merely erroneous, because the error was "'structural,' and so . . . outside [Federal Rule of Criminal Procedure] 52(b) altogether." *Id.* at 466. The Supreme Court rejected this argument, explaining that "the seriousness of the error claimed does not remove consideration of it from the ambit of the Federal Rules of Criminal Procedure." *Id.* The Supreme Court noted that Rule 52(b), which sets out the standard for plain error, "by its terms governs direct appeals from judgments of conviction in the federal system, and therefore governs this case." *Id.* The Supreme Court also "cautioned against any unwarranted expansion of Rule 52(b)," discouraging especially "the creation out of whole cloth of an exception to [Rule 52(b)], an exception which we have no authority to make." *Id.*

Even with its strong language, *Johnson* does not affect our modified plain error rule. *Johnson* rejected an attempt to ignore the language of Rule 52(b), which reads as follows:

> **(b) Plain Error.** A plain error that affects substantial rights may be considered even though it was not brought to the court's attention.

Fed. R. Crim. P. 52. The defendant in *Johnson* asked the Supreme Court to go beyond the language of Rule 52(b) by holding that she was not required to show "plain" error, as the rule requires, to gain review of a right "not brought to the court's attention." But the modified plain error rule in our Circuit does not lessen the degree of error a defendant must show to gain review. Instead, the modified plain error rule allocates the burden for considering whether a plain error "affects substantial rights." Rule 52(b) says nothing about that burden. Nor did *Johnson*: the Supreme Court explicitly declined to decide whether the error affected the defendant's substantial rights, given that the government would have prevailed for other reasons. 520 U.S. at 469.

Consequently, I would apply the modified plain error rule in this context.[16]

### b. Martoma's Jury Instruction was Plainly Erroneous

The jury instructions given at Martoma's trial permitted conviction if the jury found that the tippers "gave the information to Mr. Martoma . . . as a gift

---

[16] The panel in *United States v. Botti* wrote that *Johnson* raised questions for the modified plain error rule because, in *Johnson*, "the Court applied plain error review without mentioning modified plain error review," and "[t]he Court never placed the burden of proof on the Government." 711 F.3d at 309. But there is no reason to think that the defendant in *Johnson* argued for such a rule. It is thus unsurprising that the Supreme Court did not apply it.

with the goal of . . . developing a personal friendship." Tr. at 3191. As the majority opinion appears to acknowledge, *see* Slip Op. at 35, to say that someone gave a gift "with the goal of . . . *developing* a personal friendship" means that a personal friendship does not yet exist. The instruction thus allows the government to convict based on a gift between persons who are not friends, but might become friends later.

*Newman* held that a personal benefit cannot be inferred from gift-giving "in the absence of proof of a meaningfully close personal relationship." 773 F.3d at 452. *Salman* did not abrogate that rule. And whatever counts as a "meaningfully close" relationship, a non-existent friendship clearly is not one. The instruction is thus plainly erroneous under *Newman*.

### c. The Error was Not Harmless

The government bears the burden to show that the error was harmless, and "[a]n error is harmless in this context if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Mahaffy*, 693 F.3d at 136 (internal quotation marks omitted).

The government argues that the error was harmless because evidence at trial demonstrated a personal benefit to Gilman, the source of the information, in

37

two ways. The government argues, first, that the information was a gift within a

friendship between Gilman and Martoma, and second, that Gilman received a

pecuniary benefit in return for passing Martoma the information.[17]

Although a jury was entitled to find at Martoma's trial that either the

government's pecuniary or friendship argument satisfied this test, the

government has not carried its "burden to demonstrate that the error was

harmless." *Mahaffy*, 693 F.3d at 136.

First, it is not clear that Martoma and Gilman had the kind of meaningfully

close personal relationship required by *Newman*. A jury *could* have seen their

relationship that way. Gilman said that it "was touching" that Martoma had

---

[17] The government also argues that Ross received pecuniary benefits for speaking with Martoma. But the government states in its briefs that Martoma received from Ross the information he had already heard from Gilman. Gov't's Jan. 6, 2017 Br. at 8 n.5 ("Ross gave Martoma . . . . the same information that Gilman provided to Martoma, and on which Martoma traded; the only difference was that Gilman gave the information to Martoma first . . . ."). Although Martoma received additional confidential information from Ross at earlier times, the government does not argue that the earlier information was material, or that it played a role in Martoma's trading. If Martoma's receipt of the material information from Gilman was legal, and it served as the basis of his trades, then it would not matter that he heard the same information from Ross later.

The government suggests that the information from Ross "caused more illegal trades . . . when Ross's information confirmed what Gilman had already supplied." Appellee's Br. at 21. But the government provides no explanation of why a jury could not have believed that Martoma traded because of what Gilman had already told him instead of what he learned from Ross.

38

spent time trying to find him on one occasion, Tr. at 1240, and testified that

Martoma "wanted to be friends" and "seemed to want to be closer than I thought

a client should be to a consultant," Tr. at 1236. Gilman also stated that he thought

he and Martoma "were friends" eventually. Tr. at 1488. But jurors could also see

an ordinary, if pleasant, transactional relationship between a hedge fund trader

and a medical expert. For example, the government asked at trial whether

Gilman "enjoy[ed] consulting with [Martoma] more than other hedge fund

clients," and Gilman responded, "I enjoyed other consultations as well, but I

enjoyed speaking with him, yes." Tr. at 1236. Gilman also stated that Martoma

told him many details from his (Martoma's) life, but when the government asked

Gilman, "What did you talk to him about in your own life?" Gilman responded,

"Not much." Tr. at 1238.

Moreover, at various stages in this case, the government has expressly

denied that Martoma and Gilman had any kind of meaningfully close personal

relationship. At the first oral argument in this case, the government stated the

following:

> Judge Chin: Is it possible that the jury convicted because they
> found that Dr. Gilman provided the information
> to develop or maintain a friendship?

39

Government: *I suggest that that is not possible, your honor.* And the reason is because any friendship . . . that Dr. Gilman may have had with Mr. Martoma, and I think the defense suggests that's very small, was part of, and inextricably intertwined with, their pecuniary relationship.

Recording of Oral Argument at 26:27-26:58, *United States v. Martoma*, No. 14-3599 (2d Cir. October 28, 2015) (emphasis added). The government also described the relationship as "clearly a commercial, pecuniary relationship," given that Gilman was a "doctor[] who never spoke to Martoma before he started paying . . . and never spoke again once he stopped." Recording of Oral Argument at 34:18-34:27, *United States v. Martoma*, No. 14-3599 (2d Cir. October 28, 2015). In light of the government's own view of the issue, it would seem incorrect to hold that a reasonable jury could not have thought the same: that Martoma and Gilman did not share a meaningfully close personal relationship.

Although it is a much closer question, I would also hold that the government has failed to show that a rational jury must find that Gilman received a pecuniary benefit for disclosing the inside information on which Martoma traded. I do not disagree with the majority that, in the context of a "relationship of *quid pro quo*," *Newman*, 773 F.3d at 452, a jury *may* infer that an insider received a personal benefit from revealing information. But the jury is not

40

required to find as much, and it is not clear that, in this case, a reasonable fact-finder could not have thought otherwise.

At trial, Gilman testified that he did not bill for the sessions in July of 2008 during which he gave Martoma the information leading to Martoma's trades. Tr. at 1918. Whether Gilman was paid for his disclosures in July of 2008 thus relates to whether one believes either that SAC paid Gilman earlier in anticipation of the release of the July 2008 information or that Gilman released the information in order that he might be paid by SAC in the future.

The government cites no clear evidence that SAC paid Gilman either before or after July 2008 in return for revealing the information in question, rather than simply paying Gilman for his other consultations with Martoma. And the evidence at trial offered serious reason to doubt that Gilman took illegal actions because he wanted, as a general matter, to keep payments flowing from SAC. Testimony showed that Gilman was in high demand as an expert. From 2006 to 2010, Gilman earned at least $300,000 per year in consulting fees. Tr. at 1555-56, 1560. This income resulted from services Gilman provided to more than a dozen pharmaceutical and financial companies. Tr. at 1552-54. Gilman testified that, combining his consulting with his position as a professor at the University

of Michigan, he "work[ed] about 80 hours a week on average." Tr. at 1560. Gilman also testified that he did not recall intentionally revealing confidential information to any of his other clients. Tr. at 1628-29. This suggests that Gilman had no shortage of well-paid consulting work from companies other than SAC, and did not need to disclose confidential information to receive significant payment from those other companies. It is unclear, given this background, why Gilman would have broken the law to keep SAC as a customer.

The government also conceded at oral argument in this appeal that no one ever asked Gilman a direct question as to whether he told Martoma inside information in exchange for a monetary benefit. In the absence of such testimony, and particularly in light of Gilman's abundant consulting opportunities, a reasonable jury need not have concluded that Gilman released the information in anticipation of payment. Instead, a jury could have believed SAC's payments were for information Gilman told Martoma during other sessions—information that was either public, non-material, or did not prompt a trade, and thus was not a violation of insider-trading laws. *See, e.g.,* Tr. at 1231 (noting that Gilman began speaking with Martoma in January 2006); 1242 (Gilman's testimony that he did not reveal confidential information until "the fall to winter of 2006-7"). I would

not rule, particularly absent direct testimony on the point, that whenever inside information is revealed within a paid consulting relationship where other, legitimate service is rendered, a fact-finder must infer that the insider was paid to breach his duties.[18]

* * *

I note, in closing, that securities law is a field in which legal and ethical obligations are not coterminous. Leading scholars emphasize that insider-trading rules are under-inclusive in reaching conduct that disserves the public. *See, e.g.,* Jesse M. Fried, *Insider Trading via the Corporation*, 162 U. Pa. L. Rev. 801, 808-10, 813-14, 816-20, 826-34 (2014) (emphasizing that the law does not bar trades based on non-material information, and describing potential and actual harm to the public because of individual and corporate trades based on inside information). This is not surprising, as the Supreme Court has noted, given that securities

---

[18] The plain-error rule also requires us to determine that "the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Prado*, 815 F.3d at 100. The evidence in this case is not so strong that the change in the law was irrelevant to whether Martoma would have been convicted. And the fairness of proceedings is undermined when a defendant is convicted based on evidence that might not have persuaded a jury under rules that emerged soon after the trial ended.

regulation is built on statutes and that its principles apply broadly to many transactions in the marketplace:

> We do not suggest that knowingly trading on inside information is ever socially desirable or even that it is devoid of moral considerations. . . . Depending on the circumstances, and even where permitted by law, one's trading on material nonpublic information is behavior that may fall below ethical standards of conduct. But in a statutory area of the law such as securities regulation, where legal principles of general application must be applied, there may be significant distinctions between actual legal obligations and ethical ideals.

*Dirks*, 463 U.S. at 661 n.21 (internal quotation marks and citation omitted).

Adhering to the Supreme Court's precedent may challenge us when it leaves unethical conduct unpunished. But there is great wisdom in the Supreme Court's limitations on broad rules, particularly when those rules might otherwise allow punishment of the absentminded in addition to persons with corrupt intentions. Today, however, the majority severely damages the limitation provided by the personal benefit rule, and casts aside Circuit precedent and Supreme Court rulings to do so.

For the reasons stated, I respectfully dissent.